Edmond B. Bronson v. Commissioner.
Bronson v. Commissioner
Docket No. 3346.
United States Tax Court
1948 Tax Ct. Memo LEXIS 152; 7 T.C.M. (CCH) 415; T.C.M. (RIA) 48124; June 28, 1948
*152 In 1929 the petitioner entered into a contract with the Bagdad Company to purchase or procure purchasers of 200,000 shares of its stock for $3.50 per share, or $700,000. The contract provided for the cancellation of rights of petitioner and others, (acquired in consideration of the purchase of 600,000 shares under an earlier contract of 1927) to purchase bonds of the Bagdad Company when its mining property was fully developed and to receive, as a bonus for purchasing such bonds, 2,200,000 shares of its stock. The petitioner received 300,000 shares out of the 2,200,000 shares upon furnishing an underwriting by responsible persons to take up and pay for the 200,000 shares, and distributed such shares by delivering 148,000 of them to persons other than himself in consideration of the release of their rights under the contract of 1927, by delivering 41,000 shares to certain persons to compensate them for services rendered petitioner in disposing of the 600,000 shares under the 1927 contract, and by retaining 111,000 shares for himself. Held: (1) That the petitioner received 152,000 shares (111,000 and 41,000) in payment for his services in securing the underwriting and for the release *153 of his rights under the 1927 contract; and that, from the receipt of the 111,000 shares, he realized taxable income of $362,293.19 consisting of $266,859.04 as payment for his personal services in securing the underwriting, and $95,434.15 as gain from the disposition of his contract rights under the 1927 contract. (2) That the petitioner is not entitled to deduct as a business expense, any amount on account of the payment of compensation to others with the 41,000 shares of stock since the value of such shares constituting taxable income of the petitioner was not reported in his return and is not to be included in income under the decision herein in recomputing the petitioner's tax liability for the year 1929. (3) That the petitioner's failure to report any part of the income realized by him from the receipt of the 111,000 shares of stock was due to fraud with intent to evade tax. Mabel Walker Willebrandt, Esq., 745 Shoreham Bldg., Washington, D.C., for the petitioner. Henry C. Clark, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion TYSON, Judge: The Commissioner determined a deficiency in income tax of $103,080 for the year 1929, and, finding that the deficiency was due to fraud with intent to evade tax, he added a penalty of $53,274.62. The deficiency arises from the following adjustments by the Commissioner: (1) The inclusion in income of $388,500, that amount being the fair market value of 111,000 shares of stock of the Bagdad Copper Corporation received by the petitioner in 1929 under an agreement with that corporation of September 5, 1929; (2) the disallowance of a deduction of $39,000 as compensation for services rendered petitioner by others and paid by petitioner in shares of stock of the Bagdad Copper Corporation; (3) the disallowance of a deduction of $2,400 for a claimed loss on an investment in a social club; and (4) the disallowance of a deduction of $14,169.68, representing *155 part of the cost to petitioner of stock of the Bagdad Oil Royalty Co. and claimed as a loss due to worthlessness. The petition alleges that the Commissioner erred in making each of the foregoing adjustments and in finding that the return was fraudulent. Findings of Fact The petitioner is a resident of New York, New York. As such resident he filed a federal income tax return with the collector of internal revenue for the second district of New York for the year 1929. The petitioner became a stockholder of the Bagdad Copper Corporation, hereinafter sometimes referred to as Bagdad Company, in 1927 and, in the latter part of 1928 and the taxable year 1929 he was its president and one of its directors. He had been interested in the mining business for some years, promoting and financing mineral and oil enterprises. In the taxable year 1929 he devoted his entire time to selling stock of the Bagdad Company, purchasing shares of that corporation for his own account and reselling them at a profit and purchasing shares from the corporation for himself and selling shares to others, under contracts hereinafter mentioned, to provide capital for the development of its mineral lands. He did *156 not receive any salary from the corporation for his services as president during 1929, nor did he receive any director's fees. The petitioner reported a net income of $97,251.48 on his income tax return for 1929 and paid the tax thereon. He included in his gross income the amount of $212,104 as the profit made in purchasing and reselling shares of Bagdad stock, which profit is not here in controversy. He claimed as deductions for business expenses the amount of $40,300 as payment of compensation to others for personal services rendered him, and the amount of $2,400 as a loss on payment of his share of the cost of property purchased for use as a social club. He also claimed a deduction of $64,858.45 as a loss of an investment in stock of the Bagdad Oil Royalty Co. Bagdad Company was organized under the laws of Delaware with an authorized capital stock of $4,000,000, divided into 4,000,000 shares of common stock of the par value of $1 per share. Shortly after its organization and early in the year 1927, it issued the entire 4,000,000 shares of its capital stock in exchange for mineral lands and mining equipment situated in the State of Arizona and belonging to the Arizona Bagdad *157 Copper Corporation. The property consisted of patented lode mining claims and locations on lode mining claims, together with water rights appurtenant thereto, buildings, and mining equipment. The mining claims embraced approximately 2,200 acres. Development and exploration by the Arizona Bagdad Copper Corporation indicated that part of the acreage was suitable for mining purposes and that a tract of 60 acres contained an estimated 51,000,000 tons of copper bearing ores. The Bagdad Company planned to explore and develop the adjoining 100 acres over a period ending on August 1, 1929, with the object of proving an aggregate ore content of 100,000,000 tons, and, if that amount of ore proved to be available, to install the necessary plant and facilities with an operating capacity of 40,000 tons of ore per day. In order to secure funds for such development and operation, the vendors of the property agreed to contribute to the Bagdad Company as a capital stock donation 2,800,000 of the full paid 4,000,000 shares which they had received for the property, and the Bagdad Company entered into a contract with the petitioner on March 7, 1927, in which the petitioner agreed, as hereinafter more *158 particularly set out, that he and his assigns would purchase 600,000 shares of the donated stock at $1 per share and would underwrite and purchase a proposed issue of first mortgage bonds of the Bagdad Company with which latter purchase they were to receive the remaining 2,200,000 shares of the donated stock as a bonus. It was also agreed that the 2,800,000 shares of donated stock should be placed in escrow for disposition under the terms of the contract, and that the remaining 1,200,000 shares should be retained by the stockholders as outstanding capital stock. The petitioner received 82,554 shares out of the original issue of 1,200,000 shares in May 1927 retained by the stockholders of the Bagdad Company, and, through subsequent purchases, he increased his holdings of such shares to 84,415 at September 5, 1929. Those shares cost the petitioner $1 each. The contract, in the first part thereof designated as "Option A", granted to the petitioner and his assigns the right or option to purchase 600,000 shares of the donated stock at the net price of $1 per share. They were required to take up and pay for the first 30,000 shares on August 1, 1927, and 30,000 shares on the first day of *159 each month thereafter. In the event that they purchased the 600,000 shares as provided under option A, and upon completion of the proposed exploration and development work on the 100-acre tract, the Bagdad Company was to submit to the petitioner a detailed report on the results of the development and estimates of the ore content and of the costs of equipping and operating the property; and within 90 days after receiving such report and estimates, the petitioner was to elect whether he would proceed under "Option B". By option B, which was to become effective on the date of such election, the petitioner or his assigns were given the right to purchase, at 90 per cent of par value, the whole of an issue of first mortgage bonds of the Bagdad Company, as an entirety and not otherwise, in an amount equal to the estimated capital requirements but not in excess of $15,000,000. Upon purchase of the bonds, the petitioner was "entitled to receive as a bonus or consideration for having purchased [the bonds] as an entirety at the option price" the remaining 2,200,000 shares of the donated capital stock. Two certificates, one for 600,000 and the other for 2,200,000 shares, were deposited in escrow *160 by the Bagdad Company with the National Park Bank of New York on March 17, 1927, with instructions to hold and dispose of them in accordance with the provisions of the contract. The petitioner formed a syndicate under which the 600,000 shares covered by option A were divided into 100 units and the purchasers received from the petitioner an assignment entitling them to receive, for each unit purchased, the right to purchase one per cent of the bonds to be issued under option B and to receive as a bonus with the bonds a proportionate share of the 2,200,000 shares of stock. The petitioner and the syndicate members purchased shares of stock under option A from time to time and completed the purchase of 600,000 shares some time prior to August 1, 1929. According to the stock register of the Bagdad Company, certificates for a total of 151,000 out of such 600,000 shares were issued in the name of the petitioner between the date of the contract and April 1929. The petitioner disposed of 5,000 of such shares prior to September 5, 1929 and held the remaining 146,000 shares throughout the year 1929. The $600,000 received by the Bagdad Company from the sale of 600,000 shares under option *161 A was insufficient to enable it to complete the proposed development work, and it was unable to prepare and submit to petitioner its report and estimates within the time contemplated by the contract. It estimated that additional capital of $700,000 would be required and that the work could be completed by January 1, 1931. On September 5, 1929, the Bagdad Company and the petitioner entered into a contract, the pertinent parts of which are as follows: "WHEREAS, the Corporation and Bronson entered into an Agreement dated March 7, 1927, (hereinafter sometimes called the Original Agreement), whereby Bronson purchased or procured purchasers for * * * (600,000) shares of the capital stock of the Corporation, and has paid or caused the Corporation to be paid therefor the sum of * * * ($600,000), and pursuant to the terms of said Original Agreement the Corporation agreed to expend such moneys for the purpose, among others, of developing and investigating the properties owned by the Corporation, and it was contemplated by the parties to such Original Agreement that the above sum of money would be adequate to provide for such development and preliminary work and that the Corporation would be *162 able to complete such work by August 1, 1929, so that the Corporation could make a report as provided in such Original Agreement, and within * * * (90) days after the making of such report, Bronson and his assigns was entitled to an option to purchase additional securities of the Corporation, so as to provide the Corporation sufficient funds to finance the equipment and operation of such property; and "WHEREAS, the Corporation was and is unable to complete such development and preliminary work and to make such report either with the funds so provided or within the time provided, and it is estimated that an additional * * * ($700,000) will be necessary to complete the development and preliminary work so as to enable the Corporation to make an adequate report upon such property, and it is estimated that it will be January 1, 1931, before the Corporation will have completed such work so as to enable it to cause the report to be made; and "WHEREAS, the Corporation, by reason of the provisions of the Original Agreement, has no adequate means of raising the additional moneys necessary to complete such development and preliminary work, unless such Original Agreement be modified as herein *163 provided, and to that end the parties hereto desire to modify and supplement said Original Agreement of March 7, 1927, as herein set forth; "NOW, THEREFORE, in consideration of the mutual promises herein contained, and of the sum of * * * ( $10) paid by each party to the other, receipt, whereof is hereby acknowledged, it is agreed by and between the parties hereto as follows: * * *
"II. "Considered upon Bronson's securing and delivering to the Corporation within thirty (30) days from the date of this agreement a firm underwriting by responsible persons to take up and pay for the 200,000 shares of stock of the Corporation at $3.50 per share within ninety (90) days after the delivery of such firm underwriting to the corporation, this agreement shall become effective and the corporation will thereupon deliver to Bronson a certificate, or certificates, for 300,000 shares of stock of the corporation and thereupon the original agreement shall be cancelled and shall be of no further effect or validity. "III. "Conditioned upon this Agreement becoming effective as provided in Paragraph II. above, the Corporation agrees to sell to Bronson, and Bronson shall have, and the Corporation *164 hereby gives and grants to Bronson, the right and option, at any time within * * * (90) days after the effective date of this agreement, to purchase or find purchasers for * * * (200,000) shares of the capital stock of the Corporation for the aggregate consideration of * * * ($700,000), being at the rate of * * * ($3.50) per share. "IV. "Forthwith upon this Agreement becoming effective, the Corporation shall deposit in escrow with the Chase National Bank of New York, * * * a certificate or certificates for * * * (200,000) shares of its stock, under suitable orders and instructions for the release of such shares to or upon the order of Bronson upon payment to such escrow agent of the sum of * * * ($700,000). "V. "Conditioned upon Bronson purchasing or finding purchasers for * * * (200,000) shares of stock of the Corporation and making payment, or causing payment to be made therefor, at the price and within the time specified in Paragraph III. * * *, the Corporation hereby gives and grants to Bronson the exclusive right and option to purchase, on or before July 1, 1931, * * *, all (but without the consent of the Corporation not less than all) of the remaining * * * (1,700,000) *165 shares of stock of the Corporation at the price of * * * ($5.00) per share, payable upon the exercise of said option. "Forthwith upon the effective date of this Agreement, the Corporation will cause a certificate or certificates representing said * * * (1,700,000) shares of its stock to be deposited in escrow with the Chase National Bank of New York, under suitable orders and instructions for the release of said shares to or upon the order of Bronson upon the payment of the purchase price therefor. "VIII. "In the event that Bronson shall have exercised the option contained in Paragraph III. hereof, the Corporation shall, on or before January 1, 1931, cause to be prepared and submitted to Bronson a complete report and summary of the results of the said preliminary development and operations, * * * with estimates of the amount of developed and proven ore bodies in the property, and the methods to be employed in the mining of the same. The reports shall also contain a complete summary and report of the results obtained in said leaching and milling operations, and the methods to be adopted in practice for the treatment of such ores and the recovery of the copper contents thereof, *166 and the estimated cost of such operations. "The Corporation shall * * * cause to be prepared and submitted to Bronson complete plans and details for and estimates of the probable cost and expense of constructing a branch line of railroad from Hillside, Arizona, to the property, of equipping the property for such maximum production of ore per day as the economic conditions will permit, of building and equipping power plant, roasting or smelting and milling plants, and other necessary facilities for handling such production in one or more units of capacity, and the necessary amount of working capital which will be required. "Within * * * (90) days after the preparation and delivery of said report * * * to Bronson, but not earlier than July 1, 1931, Bronson shall be required to elect as to whether or not he shall proceed under the provisions of the option contained in Paragraph V. above, and shall give notice in writing to the Corporation of such election, copy of which shall be filed with the Depositary, providing that at any time after Bronson shall have exercised the option contained in Paragraph III. hereof and before the filing of such report Bronson shall have the right to exercise *167 the option contained in Paragraph V. "X. "In the event that this Agreement shall not become effective as provided in Paragraph II. hereof within * * * (30) days from the date of this Agreement, or such later date as may be agreed upon by the Corporation and Bronson, then this Agreement shall thereupon become null and void and the Original Agreement shall remain in full force and effect. "In the event that this Agreement shall become effective as provided in Paragraph II. hereof, and Bronson shall have completed or caused to be completed the purchase of the * * * (200,000) shares of stock of the Corporation as provided in Paragraph III. hereof, and Bronson shall not have exercised or caused to be exercised, and completed the option to purchase the * * * (1,700,000) shares of stock of the Corporation as provided in Paragraph V. hereof, on or before July 1, 1931, or if the report of the Corporation required to be filed under Paragraph VIII. hereof shall not have been filed with Bronson on or before April 1, 1931, and such option shall not have been exercised within * * * (90) days after the filing of such report, then this Agreement and all rights and options in respect to the * *168 * * (1,700,000) shares of the stock of the Corporation shall cease and determine, and the Corporation shall be entitled to the return of the certificates for such stock deposited in escrow. "XI. "Bronson may assign and transfer all or any part of his rights and interest in, to and under the provisions of this Agreement, but until the Corporation shall have received a duplicate original of any such assignment, it shall be entitled to treat with Bronson as the sole party to this Agreement. * * *" On September 5, 1929, the petitioner signed and attached to the contract of that date the following agreement: "To the Bagdad Copper Corporation, and the members of its Board of Directors. "In consideration of the execution of the attached agreement of even date entered into between the Bagdad Copper Corporation and the undersigned, I hereby agree with each of you to protect, indemnify and save you harmless from all loss, cost, obligation, damages and expenses which may be incurred or sustained by you or any of you by reason of the cancellation of the agreement dated March 7th, 1927, between your said corporation and the undersigned or the release or sale of or other disposition of *169 the stock of said corporation deposited in escrow under the terms of said agreement dated March 7th, 1927. "Done in New York City this SEP. 5, 1929." On September 11, 1929, the Bagdad Company withdrew the 2,200,000 shares held in escrow by the National Park Bank under the March 7, 1927 contract. On September 20, 1929, it deposited certificates for 1,900,000 shares with the Chase National Bank, successor of the National Park Bank, under the contract of September 5, 1929. One certificate was for 200,000 shares and the other for 1,700,000 shares. The bank was instructed to deliver the 200,000 shares to the petitioner or his assigns upon payment of $700,000, or $3.50 per share, on or before December 8, 1929. If the petitioner purchased the 200,000 shares on or before December 8, 1929 and if he elected to purchase all of the 1,700,000 shares at the price of $5 per share on or before July 1, 1931, the bank was instructed to deliver the 1,700,000 shares to the petitioner or his assigns upon payment of the purchase price. Prior to September 5, 1929, the petitioner entered into negotiations, with the holders of the rights to purchase bonds under option B of the 1927 contract, to secure *170 a waiver of such rights so that the Bagdad Co. could raise $700,000 through sales of stock. He offered them 3,000 shares of stock for each unit of participation held by them. On September 5, 1929, the petitioner entered into another syndicate agreement to become effective when the contract of September 5, 1929 with the Bagdad Company became effective as provided in paragraph II. thereof. The syndicate was divided into 100 participating units, and, upon the exercise by petitioner of the option to purchase the 200,000 shares for $700,000 under the contract with the Bagdad Company of September 5, 1929, the petitioner agreed to assign the latter contract to the syndicate. The syndicate managers agreed to exercise the option to purchase 1,700,000 shares of Bagdad stock under paragraph V. of such contract at $5 per share, and the profits from the exercise of such option in paragraph V. were to be divided among the syndicate members in proportion to their respective interests. All of the purchasers of the 600,000 shares under the contract of 1927 released their rights under that contract to subscribe for bonds and to receive stock upon payment for the bonds, and they were to receive for their *171 rights a part of the 300,000 shares. Participants in the syndicate of September 5, 1929 who had not purchased any of the 600,000 shares did not receive any of the 300,000 shares. For the purpose of purchasing the 200,000 shares, the petitioner collected the checks of the participants in the syndicate of September 5, 1929, amounting in the aggregate to $700,000, and on September 27, 1929, the petitioner transmitted the checks to the Chase National Bank for the account of the Bagdad Company, and the bank delivered the 200,000 shares of stock to the syndicate managers. The names of the participants and the amount contributed to the fund of $700,000 by each are as follows: H. M. Hanna
$ 52,500
C. C. Thompson
7,000
Elisabeth S. Prentiss
35,000
Francis F. Prentiss
$105,000
J. L. Severance
262,500
Union Trust Company
7,000
N. L. Dauby
14,000
Jesup & Lamont
49,000
R. F. Grant
3,500
Benton Henchett
35,000
Henry A. Marting
3,500
S. L. Prentiss
35,000
J. A. House
14,000
Arthur L. Canfield
7,000
S. A. Wertheim
52,500
John F. Thompson
14,000
Edmond B. Bronson
3,500
$700,000
The 300,000 shares of stock which the Bagdad Company agreed to deliver *172 to the petitioner in paragraph II. of the contract of September 5, 1929 were issued and distributed in September 1929. Of these shares 41,000 were distributed by petitioner to certain individuals as compensation for services rendered to the petitioner in connection with the sale of Bagdad stock under his 1927 contract; 111,000 of such shares were retained by petitioner; and the remaining 148,000 shares were distributed among some of the purchasers of the 200,000 shares under the contract of September 5, 1929 and among some of the participants in the purchase of the 600,000 shares under the contract of March 7, 1927. The stock register of the Bagdad Company discloses that out of the 500,000 shares of stock disposed of under the contract of September 5, 1929, the corporation issued stock certificates in the name of the petitioner on the dates and in the amounts stated below, which certificates remained outstanding in his name throughout the year 1929. Number of
Certificate Number
Shares
Date
1429
2,000
Sept. 12, 1929
1430 to 1437 (10 M. each)
80,000
Sept. 12, 1929
1455
31,000
Sept. 26, 1929
Just prior to the time when the contract of September 5, 1929 was *173 entered into, the petitioner sought legal advice concerning his liability for income tax on the transaction. He consulted Charles H. George, who was an officer of the Bagdad Company and his personal attorney; Loren M. Hart, the attorney who had prepared the contract of March 7, 1927; and H. A. Marting, the attorney who prepared the contract of September 5, 1929. He was advised by them that he would not be liable for income tax as a result of the purchase of any stock he might make under the 1929 contract. The petitioner did not report any amount as income or profit from the receipt of stock under that contract in his income tax return for the year 1929, nor did he file with the return any statement with regard to the 1927 or 1929 contracts. An examiner attached to the revenue agent's office called upon the petitioner early in 1931 and questioned the deductions of $40,300, $2,400, and $64,858.45 claimed in the petitioner's return. The examiner recommended that the $2,400 be disallowed because it was not a business expense, and that the loss of $64,858.45 be disallowed because of the petitioner's inability to furnish proof of his loss. With respect to the deduction of $40,300, the *174 petitioner informed the examiner that he had given stock of the Bagdad Company to certain individuals in payment of services, and he produced records showing the names of the payees and the amount of stock issued to each. The examiner reported that "these people are mostly employed by the Bagdad Co. and rendered no services to Mr. Bronson individually, which would be a proper charge against his income from business, which constitutes the sale of Bagdad stock personally handled himself"; that the payments were gifts "made in order to promote loyalty, etc. among the employees of the Bagdad Copper Co., which firm is practically owned by Mr. Bronson;" and that such persons had no claim against the petitioner for services rendered. On the basis of this report, the revenue agent, under date of March 27, 1931, sent the petitioner a letter demanding additional taxes in the amount of $24,786.55. On June 4, 1931, the petitioner filed a protest with the revenue agent in which he made the following statements under oath: "Findings to which exception is taken: "Disallowance of $40,300, representing cost of capital stock of the Bagdad Copper Company of Arizona, given to various persons for *175 services rendered in connection with the sale of 600,000 shares, claimed by the revenue agent to have been in the nature of gratuities. (Actual deduction should have been $42,300.) * * *
"In 1927 the taxpayer undertook to sell 600,000 shares of the Bagdad Copper Corporation and at that time was neither an officer nor director of the Corporation, and in order to complete the sale it was necessary to have the services and cooperation of various persons, some connected with the company and some not, as the taxpayer could not handle this proposition alone. In addition to services rendered by persons in the employ of said Company it was necessary to obtain the services of mining engineers, metallurgists, attorneys and others. In lieu of cash compensation for such services, commitments were made for reimbursement for such services in stock of Bagdad Copper Corporation. Taxpayer's records show that 42,300 shares were issued for services instead of 40,300 as originally claimed, and therefore the deduction should have been $42,300 instead of $40,300 as shown on the tax return, which amount was actual cost to taxpayer. "These shares were delivered in payment of a direct obligation *176 on the taxpayer's part, in accordance with an understanding with each one. The services rendered by those who were also employees of the Bagdad Copper Corporation were not a part of their duties to that Company. "The taxpayer purchased 600,000 shares of stock of Bagdad Copper Corporation from the company for $1.00 per share under an option agreement with the company. The payments and purchases were made from time to time and covered the period from March 17, 1927 to February 16, 1929, which was the date of final payment to the Company. "It was not until the taxpayer completed the purchase of the entire block of stock from the Company in 1929 that he was able to effect delivery of the shares to the individuals concerned or reimburse them for services to him. * * *
"These people rendered valuable services to the taxpayer in the sale of 600,000 shares of stock of the Bagdad Copper Corporation and the fact that some of them were employed by that Company does not justify the conclusion that they did not render services to the taxpayer nor substantiate the agent's conclusion that the taxpayer merely gave away 42,300 shares of stock that cost him $1.00 per share, as taxpayer is *177 not so well fixed financially as to be able to do this. This was not the case, but on the other hand these shares were delivered by the taxpayer as a direct obligation on his part for services rendered by him and under distinct understanding with those concerned. In the case of 5,000 of the shares paid to one of the people, there was a written contract covering the stock consideration for his services. "The taxpayer was unable to deliver any of the stock until he had completed the purchase of the entire block from the Company in 1929. Therefore he had no deduction to claim in 1928 for such expenses." * * *
The petitioner, in his protest, stated that his records would substantiate $51,260.32 of the loss deduction of $64,854.45, but he agreed to disallowance of the $2,400 deduction. In July 1931 the petitioner and his accountant had a hearing on the protest before Philip H. Fisher, a conferee in the office of the internal revenue agent. The petitioner presented a list of the persons to whom he had issued shares of Bagdad stock for services, together with a statement of the amount of stock issued to each of them, and a description of the services performed. The list disclosed *178 that, in addition to 1,300 shares issued in February, March, and April 1929, to numerous individuals in lots of 50 and 100 shares for "minor services in connection with development of Wetherbee process or the sale of my option stock", 41,000 shares were issued after the signing of the contract of September 5, 1929, in the amounts and for the services shown below: No. of Shares
Issued To
Date
Nature of Services
9,000
G. G. Thomas
Sept. 12, 1929
Mining and metallurgy
re Wetherbee process
3,000
W. Mueller
Sept. 12, 1929
Mining engineer
6,000
L. M. Hart
Sept. 12, 1929
Legal advice re option
6,000
C. H. George
Sept. 12, 1929
Legal advice re option
7,500
F. C. Hart
Sept. 12, 1929
Aid in selling stock
3,000
H. Richardson
Sept. 12, 1929
Aid in selling stock
2,000
J. J. Stubenbord
Sept. 12, 1929
Aid in selling stock
1,500
C. T. Baroch
Sept. 26, 1929
Metallurgist
3,000
A. L. Canfield
Sept. 26, 1929
Aid in selling stock The petitioner produced a copy of the contract of March 7, 1927, to establish that the above-named individuals were employed to aid in the sale of stock amounting to $600,000 shares, and to prove that the 42,300 *179 shares cost him $1 per share. He also produced records showing that he owed over 80,000 shares which he had acquired at a cost of $1 per share upon the issuance of the original 1,200,000 shares. At the time of the conference Fisher had no knowledge of the existence of the contract of September 5, 1929, and the petitioner did not tell him there was such a contract. Fisher recommended allowance of a deduction for services paid in stock in the amount of $42,300. With reference to the loss of $64,858.45 on the oil stock, the petitioner produced canceled checks for amounts invested in the Bagdad Oil Royalty Co., totaling $50,588.77, and Fisher recommended allowance of a deduction of the latter amount. On the basis of Fisher's recommendations and the disallowance of the social club investment of $2,400 the revenue agent sent petitioner a letter on November 7, 1931, demanding an additional tax of $3,469.24, which the petitioner paid. The Securities and Exchange Commission, under date of April 14, 1937, wrote a letter to the Commissioner of Internal Revenue informing him that an investigation by the Commission of the affairs of the Bagdad Company disclosed that, under the contract of September 5, 1929 the *180 petitioner had received 300,000 shares of Bagdad stock as a bonus for selling other shares of such stock and in consideration of the cancellation of an option, and that he had not reported any of such shares in his income tax returns for 1928 to 1931. The Commissioner sent a copy of this letter to the revenue agent in New York, together with the petitioner's income tax return for 1929, and the Bureau of Internal Revenue's file relating thereto, and instructed the revenue agent to re-examine the petitioner's income tax liability for the year 1929. The investigation was made by revenue agent Van Ackere. The petitioner told Van Ackere that, in addition to the contract of March 7, 1927, which had been furnished the Bureau in the conference in 1931, there was a later contract. The petitioner gave Van Ackere a copy of the contract of September 5, 1929, and sent him a list of the persons to whom the 300,000 shares of stock had been distributed and the number of such shares received by each of them. The list is set forth below: Number of
Name
Shares
Date
E. B. Bronson
111,000
Sept. 26, 1929
N. L. Dauby
6,000
Sept. 27, 1929
R. F. Grant
12,000
Sept. 26, 1929
J. A. House
6,000
Sept. 27, 1929
F. F. Prentiss
15,000
Sept. 27, 1929
E. S. Prentiss
15,000
Sept. 27, 1929
S. L. Prentiss
3,000
Sept. 26, 1929
J. L. Severance
30,000
Sept. 27, 1929
G. W. Carpenter
3,000
Sept. 10, 1929
W. G. Chamberlin
3,000
Sept. 12, 1929
M. Havens
3,000
Sept. 12, 1929
N. W. Hicks
15,000
Sept. 12, 1929
N. W. Hicks
15,000
Sept. 12, 1929
M. H. Murch
3,000
Sept. 27, 1929
F. C. Page
3,000
Sept. 12, 1929
S. Runner
3,000
Sept. 12, 1929
C. K. Sunshine
3,000
Sept. 12, 1929
B. A. Spanye
3,000
Sept. 12, 1929
J. Tuteur
3,000
Sept. 17, 1929
E. C. Thornton
15,000
Sept. 12, 1929
A. Sellers
3,000
Unknown
1,000
C. T. Baroch
1,500
Sept. 12, 1929
A. L. Canfield
3,000
Sept. 26, 1929
C. H. George
6,000
Sept. 12, 1929
L. M. Hart
6,000
Sept. 12, 1929
F. C. Hart
7,500
Sept. 12, 1929
W. Mueller
3,000
Sept. 12, 1929
H. Richardson
3,000
Sept. 12, 1929
G. G. Thomas
9,000
Sept. 12, 1929
J. J. Stubenbord
2,000
Sept. 12, 1929
Total
300,000
*181 The petitioner informed Van Ackere that he was obligated to distribute some of the 300,000 share lot among participants in the 1927 syndicate, but that those who were not in that group and who purchased shares for the first time in 1929 "were considered newcomers and were not entitled to free shares of the 300,000 shares to be divided between the stockholders." He further stated that the other 200,000 shares "were issued to the subscribers in the syndicate or to others who chose to come in." Van Ackere called the petitioner's attention to the fact that the list of distributees of the 300,000 shares of stock showed that 41,000 of such shares were distributed to the same individuals and in the same respective amounts as were represented on the list furnished by petitioner in the 1931 investigation as having received a total of 41,000 shares in payment for services out of the 600,000 shares disposed of under the contract of March 7, 1927; and the petitioner admitted that the 41,000 shares paid for services were distributed out of the 300,000 share lot. On November 17, 1938, the internal revenue agent in charge of the second New York division sent the petitioner a thirtyday letter *182 proposing a deficiency for the year 1929 of $103,080, and the addition of a penalty of 50 per cent, or $53,274.62. The proposed deficiency was based on the inclusion of $388,500 in the petitioner's income, representing the fair market value of 111,000 shares of Bagdad stock at $3.50 per share, and the disallowance of the $41,000 claimed as a business expense because paid by petitioner for services rendered him in disposing of stock under the 1927 contract. The petitioner filed a protest dated December 12, 1938. At a conference held with a conferee representing the respondent on the protest petitioner's attorney said she would appreciate it if the conference were postponed until such time as certain records necessary to the proper presentation of petitioner's position could be obtained from a federal district attorney in whose possession they were. This was agreed to. Thereafter, for a number of times each year, the conferee called on a certified public accountant who was located in New York and who was associated with petitioner's attorney in the matter to ascertain if the records were available, and on each call received a negative response. On May 11, 1943, the taxpayer came to the *183 office of the conferee and stated that he did not want to discuss the case any further. Shortly thereafter the conferee read in a newspaper that petitioner had been convicted in federal court and thereupon got in touch with the certified public accountant and told him that there was no necessity for holding the case up any further. Following this conversation the C.P.A. arranged a conference for July 19, 1943, on which date petitioner's attorney was coming to New York. The attorney did not appear on that date, but called the conferee over the 'phone soon thereafter and said she did not desire to do anything at that time because petitioner had appealed his conviction. Following this, the conferee turned the matter over to the proper office and a deficiency notice was mailed on August 6, 1943, notifying the petitioner of the Commissioner's determination of the deficiency here involved in the amount of $103,080, and of a penalty in the amount of $53,274.62. In determining the deficiency the Commissioner added the amount of $388,500 to petitioner's income and disallowed deductions of $2,400 and $39,000 for business expenses and disallowed $14,169.68 of the loss of $64,858.45 on the Bagdad *184 Oil Royalty stock, and held that the return for 1929 was fraudulent with intent to evade tax. The fair market value of the 111,000 shares of stock of the Bagdad Company on September 26, 1929 was $3.50 per share. The petitioner's income tax return for the year 1929 was false or fraudulent with intent to evade tax. Opinion This is a fraud case. The taxes involved are income taxes for the year 1929 and the assessment and collection are barred by the statute of limitations unless the petitioner's return was false or fraudulent with intent to evade tax. Section 276 (a), Revenue Act of 1928; William W. Kellett, 5 T.C. 608; Paul Plunkett & Co., 42 B.T.A. 464; Cutcliffe v. Commissioner, 163 Fed. (2d) 891. (October 24, 1947, CCA 5 Circuit). The main questions for decision relate to two adjustments of the petitioner's income, both of which involve that part of the 300,000 shares of stock of the Bagdad Company received by the petitioner under paragraph II. of the contract of September 5, 1929. The adjustments are (1) the inclusion in the petitioner's taxable income of $388,500 as representing the fair market value ($3.50 per share) of 111,000 of *185 such shares which the petitioner retained for himself; and (2) the disallowance of $39,000 of a claimed deduction of $40,300 for compensation for personal services rendered to the petitioner, which disallowed claimed compensation was paid in 39,000 of the 300,000 shares of Bagdad stock. The Commissioner in his answer charges that the income tax return of petitioner was false or fraudulent with intent to evade tax in that petitioner failed to report and include in taxable income the fair market value of the 111,000 shares received for his account and ownership, and in that he claimed the deduction for compensation on the basis of a cost of $1 per share for 39,000 shares when he well knew that such shares had a basis of zero in his hands. The questions of whether the deficiency, if any, is barred by the statute of limitations and whether the 50 per cent penalty should be imposed depend upon our finding that the return was false or fraudulent with intent to evade tax; and the burden of proving fraud is on the Commissioner, section 1112, Internal Revenue Code; Max Cohen, 9 T.C. 1156; Leonard B. Willits, 36 B.T.A. 294; L. Schepp Co., 25 B.T.A. 419; *186 and the fraud must be proven by clear and convincing evidence. Drawoh, Inc., 28 B.T.A. 666; Henry S. Kerbaugh, 29 B.T.A. 1014, affirmed 74 Fed. (2d) 749; National City Bank of New York, Executor, 35 B.T.A. 975, affirmed 98 Fed. (2d) 93; Frank A. Maddas, 40 B.T.A. 572, affirmed 114 Fed. (2d) 548. (1) Taxable Income. The petitioner contends that the 300,000 shares were purchased by him and that he paid at least $1 per share therefor; and that, therefore, there could be no realization of taxable income until he sold the shares. The Commissioner contends that the 300,000 shares constituted a bonus or commission or compensation for the petitioner's services in selling 200,000 shares of stock for $700,000 under the contract of 1929, and that the 111,000 shares which petitioner retained for his own account and ownership represent taxable income to him to the extent of their fair market value when received of $3.50 per share. These contentions present the problem of construing the 1927 and 1929 contracts together with consideration of the acts done by petitioner in carrying out the provisions thereof. *187 Under option A of the 1927 contract, petitioner and his assigns purchased 600,000 shares of stock at $1 per share to provide funds for preliminary development work on the Bagdad mining property. The Bagdad Company was to furnish reports on the development and estimates of additional capital for operation on a commercial basis within a stated time. By option B of the 1927 contract, which was contingent upon purchase of the 600,000 shares and was to take effect at the election of the petitioner 90 days after the submission of such reports, the petitioner was given the option to purchase $15,000,000 in bonds of the corporation at 90 per cent of the par value with the right to receive 2,200,000 shares of the donated stock with the bonds when the purchase of the bonds was completed. In 1929 the Bagdad Company needed an additional $700,000 to complete the preliminary development work and it considered that the only practical way in which it could raise such amount was by selling part of the donated 2,200,000 shares which were tied up under option B and held in escrow. The 1929 contract was, under paragraph II. thereof, to become effective upon the delivery by the petitioner within 30 days *188 from its date of an underwriting by responsible persons to purchase 200,000 shares of stock for $700,000, or at the rate of $3.50 per share, and as soon as the contract went into effect the Bagdad Company was to deliver to the petitioner 300,000 shares of its stock, and the 1927 contract, including option B, was to be canceled. Under paragraph III. of the 1929 contract the Bagdad Company agreed to sell to the petitioner, and the petitioner was given the right, or option, at any time within 90 days after the effective date of the contract to purchase or find purchasers for the 200,000 shares of Bagdad stock "for the aggregate consideration of $700,000, being at the rate of $3.50 per share". Under paragraph V. of the 1929 contract it was provided that, upon petitioner purchasing or finding purchasers for 200,000 shares and upon payment therefor within the 90 days, he was given the exclusive right, or option, to purchase before July 1, 1931 the remaining 1,700,000 shares of stock at $5 per share, payable upon the exercise of such option. Petitioner asks us to construe the provisions of the 1927 and 1929 contracts as a single continuing contract involving the purchase by the petitioner *189 of Bagdad stock. Petitioner contends that if so construed the effect is that petitioner received from Bagdad Company 1,100,000 shares of its stock and paid $1,300,000 therefor, - at the rate of at least $1 per share. We do not agree that those contracts should be so construed. The 1927 contract, under option B thereof, gave petitioner the right to purchase $15,000,000 or bonds and to thereupon receive 2,200,000 shares of the donated stock as a bonus, or consideration, for having purchased the bonds. The 1927 contract was entered into more than two years before the 1929 contract. The latter resulted from changed conditions, - the insufficiency of the $600,000 for carrying out the preliminary development work. Its provisions for selling and otherwise disposing of 500,000 of the 2,200,000 donated shares of stock are inconsistent with the provisions of option B of the 1927 contract. Such provisions could not coexist and create an enforceable contract. The 1929 contract, under paragraph II. thereof, provided that when the underwriting by responsible persons to purchase 200,000 shares of stock for $700,000 was delivered the 1927 contract was to be canceled, and we think that rather than *190 the 1929 contract being one with the 1927 contract that the 1929 contract abrogated the unexecuted option B of the 1927 contract when the underwriting was delivered. Where a new contract is in regard to the same matter as an earlier contract and the terms of the two contracts are inconsistent, either in whole or in substantial part so that they can not subsist together, the new contract abrogates the earlier one in toto and takes its place. Wardman v. Washington Loan & Trust Co., 90 Fed. (2d) 429. See Luster v. Gilruth, 60 Fed. (2d) 751. That is the situation here. The parties not only made a new and inconsistent agreement, but also they expressly provided therein for cancellation of the 1927 contract including option B. There was, upon delivery of the underwriting providing for the purchase of 200,000 shares for $700,000, an abrogation of the 1927 contract by mutual agreement. Concluding, as we do, that the 1927 and 1929 contracts are separate, we come then to a consideration of whether the petitioner realized any income from his acquisition of part of the 300,000 shares under the 1929 contract. The petitioner purchased 151,000 shares, or approximately *191 25 per cent, of the 600,000 shares under the 1927 contract and after disposing of 5,000 of those shares prior to the execution of the contract of September 5, 1929, retained 146,000 of such shares throughout 1929; and the remaining shares were purchased by others who, together with the petitioner, acquired contract rights under option B. After the petitioner obtained releases from the holders of such contract rights and after the underwriting provided for in the 1929 contract was secured by petitioner and delivered to Bagdad Company, the 2,200,000 shares were withdrawn by the Bagdad Company from escrow where they had been placed under the 1927 contract, and, on September 20, 1929, certificates for 200,000 and 1,700,000, respectively, of these shares were again deposited in escrow as provided by the 1929 contract. The 200,000 shares were delivered to the purchasers by the escrow agent on September 27, 1929, upon payment of the purchase price of $700,000, and the 300,000 shares were issued by the Bagdad Company between September 10 and 27, 1929. The amount of money contributed by each participant to the fund of $700,000 paid to the escrow agent for the 200,000 shares of stock and the *192 names of the persons who received part of the 300,000 shares of stock which were to be delivered to the petitioner under paragraph II. together with the number of shares received by each are set forth in the finding of fact. These findings also show that the petitioner disposed of the 300,000 shares of stock in the following manner: Seven persons who contributed 67 per cent of the $700,000 paid for the 200,000 shares received 29 per cent of the 300,000 shares as follows: Per Cent of
Stock
Per Cent of
Name
Cash Paid
$700,000
Received
300,000
R. F. Grant
$ 3.500
1/2%
12,000
4%
S. L. Prentisse
35,000
5%
3,000
1%
N. L. Dauby
14,000
2%
6,000
2%
J. A. House
14,000
2%
6,000
2%
F. F. Prentis
105,000
15%
15,000
5%
E. S. Prentis
35,000
5%
15,000
5%
J. L. Severance
262,500
37 1/2%
30,000
10%
$469,000
87,000
Nine persons who contributed 32 1/2 per cent of the $700,000, or $227,500, received none of the 300,000 shares. The petitioner, who contributed $3,500, or 1/2 of one per cent of the $700,000, received 111,000, or 37 per cent of the 300,000 shares of stock, and, in addition, he received and used 41,000 shares, *193 or 13 2/3 per cent of the 300,000 shares, for the payment of his obligation to others for services rendered him by them in selling the 600,000 shares under the 1927 contract. The remaining 61,000 shares of the 300,000 share lot, comprising 20 1/3 per cent thereof, were distributed among thirteen persons who did not contribute to the $700,000 fund and who apparently were holders of rights under option B of the 1927 contract. It thus appears that, in executing the contract of 1929, the petitioner contributed $3,500, or 1/2 of one per cent of the $700,000 purchase price of the 200,000 shares and that he received, in addition to 2,000 shares issued on September 12, 1929 (stock certificate No. 1429), 111,000 shares and the 41,000 shares distributed to other parties for their services in selling the 600,000 shares of stock under the 1927 contract, or a total of 152,000 shares out of the 300,000 block. After careful consideration of the provisions of the 1929 contract and the steps taken thereunder, we are of the opinion that the 111,000 shares of stock issued to the petitioner together with the 41,000 shares distributed to various persons to compensate them for services rendered to *194 the petitioner in connection with the sale of stock under the 1927 contract, all of which 152,000 shares were distributed out of the 300,000 shares which were to be delivered to the petitioner upon delivery of the underwriting in accordance with the provisions of paragraph II. of the 1929 contract, were received for the following considerations passing from the petitioner to the Bagdad Company: (a) The surrender of his rights, acquired under option B of the 1927 contract, to purchase approximately 25 per cent of the proposed bond issue of $15,000,000 and to receive as an incident to such purchase and as a bonus or consideration therefor a like proportion of the 2,200,000 shares of donated stock; and (b) the performance of services by the petitioner in procuring the underwriting by responsible persons of the 200,000 shares of stock as required by paragraph II. of the 1929 contract. The 1929 contract provided for the delivery of the 300,000 shares to the petitioner and for the cancellation of the contract of 1927 upon the securing and delivery to the Bagdad Company by the petitioner of the underwriting to purchase 200,000 other shares. The contract does not, in express terms, state *195 that any particular part of the 300,000 shares was to be delivered to the petitioner in consideration of the surrender of his rights under option B of the 1927 contract, or that any particular part was to be given for the petitioner's services in securing and delivering the underwriting. However, from the facts concerning the option B rights acquired by the purchasers of stock under the 1927 contract and the steps taken by the petitioner in securing the release of those rights and distributing the 300,000 shares under the 1929 contract, it will readily be seen that a great part of the 111,000 shares of stock retained by the petitioner out of the 300,000 shares represented compensation for the petitioner's services in procuring the underwriting by responsible persons to purchase 200,000 shares of stock under paragraph II. of the 1929 contract for $700,000. In September 1929 persons other than the petitioner held 454,000 of the shares sold under the 1927 contract, or approximately 75 per cent of the 600,000 shares sold under that contract, and, for the contract rights under option B which were acquired as the result of the purchase of such shares and which were surrendered or released *196 in 1929, they received 148,000 shares out of the 300,000 shares distributed to the petitioner under paragraph II. of the 1929 contract. The stock at that time had a fair market value of $3,50 per share, and the value of the 148,000 shares was therefore $518,000. The consideration thus paid to such persons was equivalent to a payment of $1.1409 for each share of the 454,000 shares. The evidence shows that the settlements with owners of approximately 75 per cent of the contract rights were made by the petitioner on the best terms obtainable and in an arm's length transaction with each owner, and, in our opinion, the average price of $1.1409 paid to all of such owners is a fair measure of what the contract rights were worth. It is reasonable to assume that the consideration received by the petitioner for the surrender of his contract rights was the same as that received by the other owners, and, as the petitioner, at the time of the 1929 contract, owned and held 146,000 of the 600,000 shares purchased by him under the 1927 contract, the consideration received by him for his contract rights under option B was $1.1409 X 146,000, or $166,571.40. The total consideration received and retained *197 by the petitioner out of the 300,000 shares for his contract rights and his services in securing the underwriting consisted of 152,000 shares (111,000 shares retained by petitioner and 41,000 shares used to pay petitioner's obligation to others for services). At the fair market value of $3.50 per share, the 152,000 shares were worth $532,000, and, as $166,571.40 of the latter amount was received by the petitioner for his contract rights, the balance of the total consideration, amounting to $365,428.60, represents the part of the consideration received by the petitioner for all his services. The measure of the petitioner's income from stock received as compensation for services is the fair market value at the time when it was received, George W. Mason, 41 B.T.A. 1287; J. K. McAlpine Land and Development Company, 43 B.T.A. 520, affirmed 126 Fed. (2d) 163. In view of the fact that the issue in this proceeding has been confined by the parties in their pleadings and in their briefs to the taxable income realized by the petitioner from the receipt of 111,000 of the 152,000 shares which were actually received, and as the Commissioner makes no claim for *198 an increase in the deficiency, the amount of income taxable to this petitioner is limited to that realized from the receipt of the 111,000 shares. Accordingly, 111/152 of $365,428.60, or the amount of $266,859.04, constitutes the proportion of the income received for services which is attributable to the 111,000 shares. In view of our conclusion that the consideration of $532,000 received by the petitioner included $166,571.40 representing the consideration received by him for the surrender of his contract rights, it becomes necessary to determine what portion of such amount constitutes taxable gain. The rights which the petitioner surrendered were rights attached to 146,000 shares purchased by him under the contract of 1927 and acquired as an incident of such purchase. Those shares, together with the rights, cost the petitioner $146,000, but no evidence was offered by either party as to the value of the rights at the time of their acquisition by the petitioner. The record therefore contains no direct evidence upon the basis of which the petitioner's cost of $1 per share may be apportioned between the shares purchased and the rights acquired in connection with them. However, we have *199 concluded, as stated above, that in September 1929, when the rights were surrendered, they were worth $1.1409 per share, and the record shows that, at the same time, 200,000 shares of the same stock without rights were sold at the price of $3.50 per share. Thus the market value of one share with rights in September 1929 was $4.6409, of which $1,1409, or 24.58 per cent, was attributable to the right. Under all of the circumstances shown by the record, we think that there was no material difference between the relative values of the stock and the rights when the rights were acquired and the relative values thereof when the rights were surrendered, and we therefore conclude that 24.58 per cent of the petitioner's cost of $146,000, or $35,886.80, is the proper amount to be used as the cost basis in determining the petitioner's gain or loss from the disposition of the contract rights. The petitioner's gain from the disposition of such rights is the difference between the total consideration of $166,571.40 and the cost basis of $35,886.80, or $130,684.60. For the reasons hereinabove stated, the petitioner's liability is limited to that portion of the income derived from the receipt of 111,000 *200 of the 152,000 shares. The amount to be included in his income as gain from the surrender of the contract rights is therefore 111/152 of $130,684.60, or $95,434.15. The latter amount, together with the amount of $266,859.04, referred to above, or $362,293.19, is the total amount of income realized by the petitioner from the receipt of the 111,000 shares of stock, and, to the extent that the Commissioner included in taxable income any amount in excess thereof, his action is disapproved. (2) Deduction of Compensation Paid to Others for Services Rendered to Petitioner. - The petitioner claimed a deduction for compensation paid by him to various persons for their services in aiding him in the sale of the 600,000 shares of Bagdad stock under the contract of 1927. The deduction was taken on the return in the amount of $40,300, and was claimed on the ground that petitioner paid the obligation with 40,300 shares of Bagdad stock which had cost him $1 per share. The respondent allowed $1,300 of the amount claimed and the issue before us is whether his disallowance of the remaining $39,000 is proper. The evidence shows that the 39,000 shares of Bagdad stock, representing $39,000 of the *201 deduction claimed on the return, and 2,000 additional shares not included in the deduction, or a total of 41,000 shares, were paid by the petitioner to various persons for their services and that the shares were issued directly to them out of the 300,000 shares received by the petitioner under paragraph II. of the contract of 1929. The respondent does not argue that the petitioner's obligation to pay for the services is not an ordinary and necessary business expense and contends only that the 41,000 shares, having been received by the petitioner as compensation for his services, have a basis of zero in his hands and that therefore no deduction is allowable. The petitioner adheres to the position taken on issue (1), supra, that he purchased the shares and paid at least $1 per share, but we have decided this question against him. In the disposition of issue (1), supra, we have found that in the distribution of the 300,000 shares the petitioner received 111,000 shares for his own use, together with the 41,000 shares above-mentioned, or a total of 152,000; that the 152,000 shares were received in consideration of the surrender by the petitioner of his rights under option B of the contract *202 of 1927 and in consideration of the performance of services by the petitioner in procuring the underwriting mentioned in paragraph II. of the contract of 1929; that the fair market value of the 152,000 shares was $532,000, of which $166,571.40 was received for the surrender of the option B rights, and of which $130,684.60 represented petitioner's gain, and that $365,428.60 thereof was received for the petitioner's services. On the basis of such findings, we have held further that the amount of income realized by the petitioner from the receipt of the income under issue (1) is the sum of 111/152 of the petitioner's gain from the surrender of rights ($95,434.15) and 111/152 of the amount received by petitioner for his services ($266,859.04), or $362,293.19. The income realized by the petitioner from the receipt of the 152,000 shares, representing the portion of the whole attributable to the receipt of the 41,000 shares, consists of a gain of $35,250.45 realized from the surrender of contract rights and income of $98,569.56 received for services. Although the petitioner realized taxable income of $133,820.01 from the receipt of the 41,000 shares in 1929, he did not report any amount *203 whatever as income in his return for that year. As the petitioner did not report any of the income realized from the receipt of the 41,000 shares and as under our decision in this proceeding none of such income is to be included in income in recomputing the petitioner's tax liability for 1929, the petitioner is not entitled to any deduction on account of the distribution of the 41,000 shares to others in payment of compensation for services rendered him. Commissioner v. Farren, 82 Fed. (2d) 141; Alamo National Bank, 36 B.T.A. 402, affirmed 95 Fed. (2d) 622, certiorari denied, 304 U.S. 577. See also Stearns Co. v. United States, 291 U.S. 54. (3) Deduction of Social Club Investment and Oil Stock Loss. - The action of the Commissioner in disallowing the deductions of $2,400 for the investment in a social club and $14,169.68 of the loss for worthlessness of Bagdad Oil Royalty stock is approved for failure of the petitioner to submit proof in support of the deductions. (4) Fraud. - We have, in extenso, set forth facts and discussion thereon with reference to the questions: (1) of whether petitioner improperly omitted *204 from his income the fair market value, or any part thereof, of the 111,000 shares of stock involved in respondent's first adjustment; and (2) whether petitioner was entitled to take a deduction of $39,000, or any part thereof, which he paid others in stock of the Bagdad Company for services rendered him in selling the 600,000 shares under the 1927 contract, - this latter question being presented by respondent's second adjustment. As shown above, we have reached conclusions adverse to petitioner on these questions. It has been necessary to reach conclusions on the two questions since had we reached contrary conclusions to those we have reached there would be no occasion to consider any further facts or circumstances on the question of fraud as it relates to those adjustments; and since having reached the conclusions we have the matter of fraud must now be considered. On this question the respondent contends that the petitioner acted with fraudulent intent to evade tax (1) in failing to report as income the amount of $388,500, representing the fair market value of the 111,000 shares of stock which he received and retained out of the 300,000 shares distributed under the 1929 contract, *205 and (2) in claiming $39,000 of the deduction for compensation paid to others for services rendered the petitioner in selling 600,000 shares under the 1927 contract, based on a cost of $1 per share for 39,000 shares, when he knew that the 39,000 shares had been received for his services and had cost him nothing and were shares with a zero basis. Petitioner contends that there was no such fraud or intent. We have held that the 111,000 shares retained by the petitioner under the 1929 contract were acquired by him for a consideration consisting of his contract rights under option B of the 1927 contract and his services in procuring the underwriting under the 1929 contract. The petitioner did not report this transaction in his return for 1929 and he did not attach to his return the original or a copy of either the 1927 or 1929 contract or make any reference thereto. Our first inquiry on this issue is whether his failure to report any amount as income from the receipt of the 111,000 shares of stock was due to fraud with intent to evade tax. The petitioner is a man of wide business experience. He has been interested in financing mineral and oil properties for over forty years, and, during *206 the taxable year 1929, he was engaged in buying stock of the Bagdad Company and reselling it at a profit. It was because of his experience and success in financing mining projects that the Bagdad Company turned to him when it needed an additional $700,000 in 1929 for preliminary development work. Performance of the contract of 1929 was contingent upon the underwriting by responsible persons of the purchase of 200,000 shares for $700,000; and the petitioner performed valuable service in procuring the underwriting. He received the 300,000 shares of stock upon delivery of the underwriting. He used 148,000 of such shares in making settlements with the owners of contract rights under option B of the 1927 contract and kept the remaining 152,000 shares for himself, using 41,000 shares to compensate those who had rendered service in selling the 600,000 shares under the 1927 contract. The petitioner personally handled the distribution of the 300,000 shares of stock under the 1929 contract and was familiar with all details of the transaction. He knew that the stock was valuable and that he did not pay any cash consideration for the 152,000 shares. He also knew that the only consideration passing *207 from him for those shares consisted of his personal services and the surrender of his contract rights under the 1927 contract; since the terms of the 1929 contract are, in this respect, plain and unambiguous. He must have known that at $3.50 per share, the fair market value of the 111,000 shares was $388,500, a value far in excess of any basis which might be attributed to the contract rights which he surrendered. He also must have known that the value of the consideration received for his services, when considered separate and apart from the value received for his rights, was great and that at least that value constituted income which should have been reported as such in his return. We think that one with petitioner's wide business experience could hardly be said to be ignorant of his duty to report such income. All the facts and details of the transaction relating to the 111,000 shares were known to petitioner at the time when he filed his return for 1929, and we think that his failure to report any income from it was due to fraud with intent to evade tax. The intent to defraud is further indicated by the facts that, although his dealings in Bagdad stock were subjected to investigation *208 after the return was filed, the petitioner did not disclose the existence of the 1929 contract to the Government agents, and that he continued to conceal its existence until it was finally brought to light in the investigation by revenue agent Van Ackere in 1938 upon information furnished by the Securities and Exchange Commission. Petitioner further contends that any intent to defraud is refuted by his reliance on advice of counsel. The fact that the taxpayer relied upon the advice of counsel has, on occasions, been held to be sufficient to establish the absence of an intent to evade tax. Merten's Law of Federal Taxation, Volume 10, [*] 55.27, and cases cited thereunder; Rogers Recreation Co. v. Commissioner, 103 Fed. (2d) 780. But if advice of counsel is relied upon the advice must be on the point involved and the taxpayer must turn over to counsel full information. Merten's Law of Federal Taxation, Volume 10, [*] 55.27, and cases cited thereunder; Paul Plunkett & Co., 42 B.T.A. 464, 470, and cases cited; Louis Ginsburg, 13 B.T.A. 417; and E. M. Green, 11 B.T.A. 278. The petitioner testified that he sought the advice of his *209 personal counsel, Charles H. George, whose name appears on the briefs filed herein as "Of Counsel" for petitioner, and the petitioner and George testified as to the advice given. Their testimony is to the effect that petitioner asked George, in August 1929 when the contract of 1929 was being negotiated and before it was executed, whether there would be any tax liability on stock thereafter purchased by petitioner under the proposed contract of 1929, and that George advised the petitioner there would be no liability until the stock was sold. George took no part in the preparation of the contract nor did he read it after it was prepared and signed. He read it, for the first time, a few days before the trial of this case. The petitioner also testified that he received similar advice from an attorney who represented the stockholders in the transaction and from the attorney of the Bagdad Company who prepared the 1929 contract. The advice sought and given was not based upon what was actually done by the petitioner. Under the 1929 contract the petitioner undertook to purchase or procure purchasers for the 200,000 shares at $3.50 per share. If the petitioner had paid the entire consideration *210 of $700,000 and had received 200,000 shares under the option and 300,000 shares upon signing the contract, it might be argued, with plausibility, that he purchased the entire 500,000 shares. However, the fact is that practically all of the $700,000 was paid by persons other than petitioner. While the petitioner and witness Grant in their testimony state that petitioner paid $700,000 of his money to the Chase National Bank, that is untrue. The documentary evidence shows that this money, with the exception of $3,500 paid by petitioner for 1,000 shares, consisted of checks by members of the syndicate formed by petitioner to purchase the 200,000 shares, and Grant, at another point in his testimony, stated that petitioner gathered these checks and turned them in to the bank. We conclude that the advice of counsel given petitioner was only to the effect that such stock as he might purchase under the 1929 contract would not involve a taxable transaction until such stock was sold, and that such advice was not given upon what was thereafter actually done under the contract. Since we are of the opinion that the failure of the petitioner to report any income from the transaction involving the *211 receipt of the 111,000 shares of stock was due to fraud with intent to evade tax, it is unnecessary for us to consider and pass upon the respondent's second contention that the petitioner's return was fraudulent in claiming the deduction of $39,000. The statute authorizes the imposition of the penalty "if any part of the deficiency is due to fraud with intent to evade tax." Section 293 (b), Internal Revenue Code. Nor is it necessary for us to consider whether there was fraud in claiming the deductions of $2,400 and $14,169.68 covered by the third and fourth adjustments of respondent. However, it may be noted that the record contains no facts concerning them other than that they were claimed as deductions on the petitioner's return and that the petitioner conceded in this protest of June 4, 1931 that he was not entitled to the deduction of the item of $2,400. Upon consideration of the entire record we think that the evidence shows clearly and convincingly that the petitioner's return was false and fraudulent with intent to evade tax. The amount of the deficiency and penalty should be redetermined in accordance with the views expressed in this opinion. Decision *212 will be entered under Rule 50.