THE NATIONAL CITY BANK OF NEW YORK, EXECUTOR, ESTATE OF JAMES E. O'NEIL, DECEASED, NEW YORK, N. Y., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 77333. Promulgated April 27, 1937.

*H. B. McCawley, Esq.,* and *E. W. Shinn, Esq.,* for the petitioner. *DeWitt M. Evans, Esq.,* and *John M. Morawski, Esq.,* for the respondent.

982

984

988

OPINION.

DISNEY: The parties are in agreement (except for an alternative question raised by the petitioner, hereinafter discussed) that assessment and collection of taxes involved herein are barred by the statute of limitations unless the decedent filed fraudulent returns for the taxable years with intent to evade taxes. In such cases the "amount of tax due may be determined, assessed, and collected, * * * at any time after it becomes due." Sec. 250 (d), Revenue Act of 1921. The decedent having died prior to the determination of the deficiencies, fraud penalties are not involved.

The respondent having asserted fraud, he is charged with the duty of establishing it by more than a mere preponderance of the evidence. The evidence must be clear and convincing. *Lalone* v. *United States*, 164 U. S. 255; *M. Rea Gano*, 19 B. T. A. 518; *Drawoh, Inc.*, 28 B. T. A. 666; *Henry S. Kerbaugh*, 29 B. T. A. 1014; affd., 74 Fed. (2d) 749; *Budd* v. *Commissioner*, 43 Fed. (2d) 509; *Charles E. Mitchell*, 32 B. T. A. 1093; *Harry Feldman*, 34 B. T. A. 517.

Fraud is "essentially a matter of motive and intention." *Wood* v. *United States*, 41 U. S. 341. One alleging fraud is rarely able to prove it by direct evidence. Generally the true nature of the matter in controversy can be determined only from a careful examination of all of the circumstances relating to the transaction. The range of inquiry is broad.

In 1922 and 1923 the Continental Co. derived large earnings from the sale of oil under the contract of November 17, 1921, practically all of which were invested in Liberty bonds, and distributed to the decedent, Blackmer, Sinclair, and Stewart in substantially equal amounts. The remainder of the bonds, or their proceeds, were delivered to Osler. The petitioner admits that of these bonds the decedent in 1922 and 1923 received a total of $727,000 principal amount from

the Continental Co. and does not question the distribution of the securities as earnings of the corporation. The decedent did not report or disclose the receipt of the earnings or bonds in his income tax returns, and the respondent was not aware of the distributions until about six years later. The decedent was required to make a full and complete disclosure of all items of gross income. Sec. 223 (a), Revenue Act of 1921. His intentional failure to include in a return, or otherwise reveal to the Government, large amounts admittedly received as profits of a corporation is evidence of a fraudulent purpose. *M. Rea Gano, supra; D. C. Clarke*, 22 B. T. A. 314; *Charles E. Mitchell, supra; Harry Feldman, supra.*

Persons guilty of fraud seldom fail to allege justification for their acts. Here the petitioner seeks to justify the failure of the decedent to report the income in question on the ground that O'Neil "never considered the bonds received by him as his property and there was never any adverse claim as between him and his company with regard to them and he never received or held the bonds under any claim of right" and that he "never intended to keep the fund represented by the bonds, and in fact did not keep it." The petitioner contends that these facts are proved by direct testimony in the record, all of which was offered by respondent's witnesses.

The testimony relied upon in particular is that of Fitzpatrick, Kountz and Wayne O'Neil, son of petitioner's decedent, based upon statements made to them, or in their presence by the decedent himself, as to the receipt of the bonds and his intentions; especially his statement that he considered the bonds as belonging to the Prairie Co. and intended that they be delivered to the company. These statements were obviously self-serving in their nature. They are to be weighed as against evidence indicating a contrary intent on his part. They were made after the decedent had had an abundance of time in which to contemplate the full import of the transaction, and largely when the activities of the Continental Co. were the subject of inquiry by the Government. The remarks of the decedent, all of which were made after the Continental Co. had dissolved, most of them about two years later, in the light of other acts of the decedent with reference to the profits, seem to be nothing more than a belated effort to advance some sound reason for failing to make an earlier disclosure of the gains to the Prairie Co.

The decedent was president of the Prairie Co. until after the charter of the Continental Co. was surrendered for cancellation. If during such period he ever entertained doubt as to real ownership of the bonds he had received from the Continental Co., a desire to deal honestly with his employer would have caused him to make a full and complete disclosure of the facts to it for a final determina-

tion of the question. He resigned as president of the Prairie Co. in September 1923 and shortly thereafter left the United States, going to France. Any reasonable consideration indicates that at that date he would have settled the matter with his employer. No reasonable explanation appears as to why, after resigning, he continued to hold possession of these bonds, which, under petitioner's theory, did not belong to him and were not claimed by him. He did retain possession. Possession is prima facie evidence of title to both personalty and realty. Ownership is presumed from possession. Jones Com. Evidence, 2d ed., vol. 1, pp. 496, 498. Not only was he in possession, but it was without disclosure to the Prairie Co. He made no such disclosure during the period of his presidency of the Prairie Co., nor until May 1925, and then the facts were not "discussed elaborately", to use the language of Fitzpatrick. In the meantime the decedent used at least part of the bonds as if they were his own property. He cut the coupons maturing in 1922 and 1923 on the identical bonds, some of which coupons he cashed, actually disposed of $31,000 of the bonds in 1924, and during 1923, $148,000 principal amount of the bonds reached his brother-in-law as a gift from the decedent's wife. If the identical bonds received from the Continental Co. were ever set aside for delivery to the Prairie Co., when, if ever, it suited the convenience of the decedent, at least a part of them was removed for other purposes, and none of the bonds delivered to the Prairie Co. in 1925 were the identical bonds received from the Continental Co. Aside from those just referred to, we do not know what disposition the decedent made of the actual bonds which he received from the Continental Co.

Petitioner's theory is that O'Neil's delivery to the Prairie Co. in 1925 of other bonds in lieu of those received by him indicates that he never claimed personal ownership. But does it not reasonably indicate just the contrary? Though possession is, as above seen, prima facie proof of ownership, it is obvious that logically there is still stronger presumption of ownership of property from acts or dealings which are consistent only with ownership. Therefore, does not the fact that O'Neil delivered in 1925 not the original bonds received by him, but a substitute, indicate strongly that he had dealt with the original bonds as his own? He is thus seen not to be *delivering* property to its owner, but making settlement because of having treated or disposed of as his own the original bonds. Such dealings with these bonds can not fairly nor reasonably be explained upon any theory except claim of ownership; they are not satisfactorily so explained by self-serving declarations reported by a son as a witness, the weight of whose testimony is naturally and properly to be carefully considered, nor equally self-serving

statements of intention made by O'Neil later in connection with some sort of settlement with the Prairie Co.

Moreover, the evidence is plain that he had such income. The subject of conversation between O'Neil and the president and general counsel of the Prairie Co. was the profits that he made in a deal of that kind. O'Neil told the Prairie Co.'s officers that the bonds came to him "as part of the profits of the Continental Trading Company", and that "he had this interest in the profits." The Prairie Co. carried out his request for secrecy, and as to payment of the tax, and in connection therewith, and before paying the tax, passed a resolution on May 1, 1928, which recites that O'Neil delivered on May 18, 1925, $800,000 in U. S. Liberty bonds "representing the profits to the said J. E. O'Neil accruing to him individually" in connection with the Continental Trading Co. contract, and that the tax be paid "on account of the agreement made with the said J. E. O'Neil." Petitioner objects to this resolution as hearsay, incompetent, irrelevant, and immaterial. But, upon petitioner's own theory that the Prairie Co. was O'Neil's principal, it is at once seen that the resolution is a declaration by the principal as to the matters of agency; while upon the theory of trusteeship in O'Neil it is a declaration by the *cestui que trust*, and admissible as such. Jones on Evidence, vol. 2, p. 1663; 1 Greenleaf on Evidence, ¶¶ 179, 180. There is such privity between O'Neil and the Prairie Co. as makes this declaration or admission by the Prairie Co. competent here. It was made in intimate connection with the request by O'Neil that the tax be paid. The Prairie Co. was simply carrying out an agreement with O'Neil himself and we think its corporate records entered in carrying out a contract are competent declarations to the parties to such contract. The Prairie Co. had been by O'Neil by this contract constituted his agent for payment of this tax in his stead, and O'Neil is therefore bound by its declaration, which accompanied and was in the course of the performance of the agency. Jones on Evidence, vol. 2, p. 1741.

Another circumstance of vital importance here is this: Had O'Neil in good faith considered himself to have received the Liberty bonds for the Prairie Co. as trustee, it would have been his duty to have filed a return as a fiduciary, showing the Prairie Co. to be beneficiary. The petitioner does not contend that any such fiduciary return was filed, makes no attempt to show that the Government was apprized of the situation until several years later, and the testimony of Fitzpatrick discloses that O'Neil told him that he "never had returned any part of that profits with his income." Had O'Neil filed such a return as fiduciary, without doubt petitioner would so contend. Moreover, the fact that O'Neil delivered the approximate equivalent

of the full amount of the bonds to the Prairie Co. demonstrates that he never paid and deducted any tax, as would have been done had he made a fiduciary return, he not having made distribution to his alleged beneficiary until 1925. In *Grace H. Crawford*, 30 B. T. A. 832, 836, we considered such a situation, commented on the fact that no return was filed as fiduciary, and further said:

\* \* \* From the returns filed the respondent could not determine that the petitioner's brother was liable for tax upon any portion of the income deposited to her credit in the joint account. \* \* \*

Here, too, in the absence of a fiduciary return by O'Neil and any return by the Prairie Co. (which only learned of the bonds in 1925) the respondent could not determine tax against the Prairie Co. All of these considerations can lead us to one conclusion only—that despite any declarations as to what he had intended to do with these bonds, O'Neil received them in his individual capacity and that they constituted income to him. No explanation is even attempted as to any reason why O'Neil should be holding these bonds for his company. Even his directions to his son show intent to retain control until death. Every circumstance of fact contradicts his asseverations of possession for his company. In *Jones v. Securities Commission*, 298 U. S. 1, 30, Mr. Justice Cardozo says: "Recklessness and deceit do not automatically excuse themselves by notice of repentance. \* \* \*"

Protestations of innocence, however vigorous, by the party involved do not necessarily establish absence of fraudulent intent. *Charles E. Mitchell, supra*, (1129); *Sydney M. Shoenberg*, 30 B. T. A. 659, 661. The facts under which O'Neil finally did turn approximately a substitute for the bonds to the Prairie Co. are such as to throw doubt even upon repentance, and to indicate rather an attempt to escape consequences of acts then becoming known. He knew that the United States was inquiring into the matter, for the interrogatories propounded to him in France in February 1925, some three months before he delivered the bonds to the Prairie Co., showed him plainly that the United States suspected him of having received income from the Continental Trading Co., and, with the matter being investigated in court, it could not reasonably escape the knowledge of the Prairie Co.

Until publicly disclosed in 1928, the actual recipients of the income of the Continental Co. were unknown to the Government. Prior thereto the decedent not only made no effort to acquaint income tax collecting authorities with the profits distributed by the Continental Co., but endeavored to conceal the fact from the Government. Taxpayers dealing with the Government are required to turn "square corners." *Rock Island, A. & L. R. Co. v. United States*, 254 U. S. 141. Contrary dealings, involving active concealment of the taxable

income, constitute substantial evidence in the establishment of fraud with intent to evade tax. There was concealment of income which actually was received in 1922–1923. The Prairie Co. did not conceal it in 1922 and 1923, for it did not have knowledge thereof. O'Neil did have that knowledge, did make returns, which did not include this income. He refused to answer direct interrogatories as to this income when questioned by Government counsel under letters rogatory in the case of *United States* v. *Mammoth Oil Co., Sinclair Crude Oil Purchasing Co., and Sinclair Pipe Line Co., supra.* He not only did not relate in full to Fitzpatrick in Montreal in May 1925 the activities of the Continental Co., but gave the order on his son for $800,000 of Liberty bonds with the request that the Prairie Co. not disclose the receipt of the securities nor cash the coupons therefrom. The informal manner in which the bonds were recorded in the books of the Prairie Co. and its failure to cut the coupons maturing on the securities thereafter is evidence of an effort to carry out its part of his request. The foundation for the effort to continue concealment of the bonds is, according to a remark of the decedent testified to by Fitzpatrick, that a disclosure would result in embarrassment to others. Taxpayers are charged with the duty of voluntarily reporting income annually for tax purposes. The obligation fully to disclose the receipt of profits derived legally or illegally can not be voided by a belief, however reasonable it may be, that the recipient or others will suffer embarrassment. Tax on income may not be deferred until a taxpayer concludes his fraudulent operations, or while he protects others. That there was concealment here, from 1925 when the Prairie Co. received the bonds, until 1928 when it paid a portion of the tax due from the Continental Co., is impossible of refutation; moreover, it is equally plain that it was a continuation of previous concealment by O'Neil.

It is well settled that reporting income for tax purposes may not be delayed to a future year on the ground that subsequent events may result in the determination that the recipient was not entitled to it. The rule was stated in *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, in the following language:

\* \* \* If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. See *Board* v. *Commissioner of Internal Revenue* (C. C. A.) 51 F. (2d) 73, 75, 76. Compare *United States* v. *S. S. White Dental Manufacturing Co.*, 274 U. S. 398 \* \* \*.

In *Board* v. *Commissioner*, 51 Fed. (2d) 73, affirming 14 B. T. A. 374; certiorari denied, 284 U. S. 658, the petitioner and four other

stockholders of the corporation took over a contract which the corporation had entered into for the construction of a pipe line. The pipe line was completed on the joint credit of the individuals and the corporation, and, upon the subsequent sale of the property, the stockholders distributed a portion of the profits among themselves. Other stockholders contested the distribution, but subsequently permitted the petitioner and another stockholder, then acting as liquidating trustees for the corporation, to retain the profits on condition that they waive their right to further compensation for services as liquidating trustees. In holding that the income was taxable when received rather than the year in which the agreement was reached, the court said:

* * * The only claim made is that the contract whereby petitioner purported to secure his interest in the pipe line was illegal and unenforceable by reason of his position as a director of the Old Dominion Oil Company. In this contention the petitioner of course never acquiesced. The payment was never refunded. Possibly it might have been recovered in the litigation which was instituted for that purpose, but it was not, and it is at least unusual that a taxpayer should be heard to assert the possibility of an adjudication of alleged misconduct and breach of trust, as relieving him from tax liability which is predicated upon the assumption of the honesty and legality of his acts. * * *

In *Ford* v. *Commissioner*, 51 Fed. (2d) 206, affirming 19 B. T. A. 1143; certiorari denied, 284 U. S. 666, dividends were received in 1922 on stock illegally distributed by an executor in that year. In 1926 the probate court sanctioned the distribution as of the close of 1922 provided the distributees were charged with interest to that date on what they had received. In holding that the dividends were taxable in 1922 the court said:

* * * Certainly they then had complete legal title to the stock and to the dividends. If taxes regularly assessed could be invalidated, an indefinite number of years later, by a consent judgment purporting to vacate the title of the taxpayer to the fund he had reported as income, the necessary system of tax collection would be much impaired. The true normal criterion to be applied in this class of case is the actual receipt and retention during the year in question of what was then considered to be income, not whether the taxpayer exposed himself to possible personal liability.

For other cases in which the principle has been applied see *James P. McKenna*, 1 B. T. A. 326; *Edgar B. Terrell*, 7 B. T. A. 773; *Herbert J. Blum*, 27 B. T. A. 1033; aff'd., 74 Fed. (2d) 482; certiorari denied, 295 U. S. 732; *Highland Milk Condensing Co.* v. *Phillips*, 34 Fed. (2d) 777; certiorari denied, 280 U. S. 608; *Brooklyn Union Gas Co.*, 22 B. T. A. 507; aff'd., 62 Fed. (2d) 505; *Commissioner* v. *Darnell, Inc.*, 60 Fed. (2d) 82; *Florence B. Fawsett*, 23 B. T. A. 1148; aff'd., 63 Fed. (2d) 445; certiorari denied, 290 U. S. 641; *Erwin R. Effler*, 29 B. T. A. 784; *D. H. Byrd*, 32 B. T. A. 568; *Chicago, Rock Island & Pacific*

*Railway Co.*, 13 B. T. A. 988, 1022; affd., 47 Fed. (2d) 990; certiorari denied, 284 U. S. 618; *Lewis* v. *United States*, 17 Fed. Supp. 543.

The petitioner argues, however, that the principle running through the above cases has no application here, contending that the decedent received the bonds as the result of a transaction entered into within the scope of his agency as an officer of the Prairie Co., and that receipt by him was receipt by his principal. From this premise it says that whatever the decedent received as profits of the Continental Co. was acquired as agent or trustee for the Prairie Co. and constituted income to it in the years received. Numerous authorities are cited for the settled principle that officers and directors of corporations, and agents, are required to account to their principal for secret profits earned in discharging the duties of their agency.

The effect of the argument is to set up unfaithfulness of the decedent to the Prairie Co. as a means of escaping payment of the taxes involved here. If accepted, it would enable a taxpayer to avoid the consequences of one fraudulent act by showing another one. It is opposed to the maxim that "a wrongdoer will not be heard to urge his own wrongdoing, or the illegality of his own acquisition, in bar of rights of third parties * * *", *James P. McKenna, supra*. Under the theory advanced by the petitioner, tax on income could be avoided by deferring payment to the principal until assessment and collection were barred. Revenue acts are designed to collect revenue and not to provide means for tax evasion. The argument assumes that the profits were taxable income to the Prairie Co. in 1922 and 1923, years during which it had no knowledge of the distribution of the bonds to the decedent. While we do not have before us the question of the year or years in which the amount of the earnings is taxable to the Prairie Co., *North American Oil Consolidated* v. *Burnet, supra*, appears to be directly opposed to the idea that the income was taxable to the Prairie Co. prior to 1925, the year in which it first learned of the receipt of the bonds by the decedent and itself received them.

The petitioner must face the fact that there is no showing here that O'Neil was constituted the agent of the Prairie Co. for the purpose of organizing the Continental Co., making a profit through it, and then distributing that profit to it. The right of the Prairie Co., if any, would be established in equity. There appears not even a ratification of O'Neil's acts, but recognition that O'Neil received the bonds in his individual capacity.

The profits distributed by the Continental Co. in 1922–1923 were income to whomsoever was distributee thereof. Were they not income to O'Neil? He was, in fact, the distributee, having actually received

the bonds distributed. If he received them under a claim of right and without restriction as to disposition under *North American Oil Consolidated* v. *Burnet, supra:* if they were "then considered to be income" by him, under *Ford* v. *Commissioner, supra*, obviously the income was that of O'Neil. The statutory definition of income is not narrow. Can it reasonably be said that as to O'Neil these bonds were not gains or profits "of whatever kind and in whatever form paid", or that they were not "income from any source" whatever, under the statute. We have hereinabove examined the record and have concluded that he received the bonds in his individual capacity with intent to keep the same as his own. "Claim of right" as used in the above citation can mean only claim of right to title. His possession and his use and disposition of the bonds, as above seen and concluded, not only raise a presumption of claim of ownership, but convince us fully that he considered himself the owner. He was, in fact, the legal owner. The bonds passed to bearer. He was the bearer. The record herein does not disclose the receipt of the bonds by O'Neil in the capacity of agent, but on the contrary shows a duly organized corporate entity, making a profit on a business contract, purchasing Liberty bonds therewith, and distributing them to him and four other men, including its president. As stated in *Ford* v. *Commissioner, supra*, "certainly they then had complete legal title * * *", and alleged equities can not in later years be used to affect income. We can not, without good reason, disregard corporate entities such as the Continental Co., an active corporation, and it follows that we can not fail to give at lease prima facie effect to its distributions of profits to O'Neil, and recognize him as legal owner thereof.

Was there any restriction as to disposition of the bonds in O'Neil's hands? He disposed of or kept not only a part, but all of the bonds, for what he delivered in 1925 to the Prairie Co. was other bonds, perhaps an equivalent, but indubitably not the same bonds received by him. Even the equivalence is only approximate. There was a compromise, for the Prairie Co. did not receive interest on the coupons which had been clipped. No reasonable view can be taken that O'Neil considered that there was any restriction on disposition. It would require disregard of the whole complexion of the evidence, as well as its details, to believe that O'Neil was at all times holding these bonds for the Prairie Co. We refuse to close our eyes to facts so obvious as those here involved. We must and do conclude that O'Neil considered these bonds as income to himself and that he considered himself bound by no restriction as to disposition.

The cases cited by petitioner, involving as they do the ordinary situation of agreed relation of principal and agent, have no application here. Of course, income to one who agrees with his principal

that he is agent, is income to the principal; but it is not helpful to adduce such cases as authority in a case involving the factual situation here at hand. One whose every act belies any intent to recognize himself as an agent can not, by some contractual arrangement with another party at a *later* time, convert himself retroactively into an ordinary agent and impose the effect of such agency upon the sovereign seeking tax. The agreement between O'Neil and the Prairie Co. may, or may not, have rested wholly on the one idea of breach of trust or agency on O'Neil's part. The Prairie Co. did not recognize O'Neil as its agent in any formal way, to say the least. They paid tax not for themselves, but for O'Neil as transferee of the Continental Co., as the corporate resolution shows. The petitioner has not seen fit to explain O'Neil's reasons, if any there were, for retention until 1925 of bonds which it says belonged in equity to the Prairie Co., or why he delivered the bonds to them when he did. There may have been other contracts or agreements, relations other than ordinary agency or trusteeship between O'Neil and the Prairie Co., which entered the equation and contributed to cause delivery of the bonds. Though the burden of proof is on the Commissioner as to the fraudulent concealment of income, we have found that a prima facie case of ownership was established by the possession and disposition in various ways of the bearer bonds obtained by O'Neil from a duly organized corporation. Petitioner has not met such presumption by showing by any sufficient or convincing evidence that such ownership was in the Prairie Co. The mere fact of delivery of bonds alone, without determination of legal rights by any court upon examination of the facts, or even suit filed, by no means is determinative here—most emphatically where the petitioner vouchsafes no explanation of reasons for the apparent prior claim of ownership of bonds by O'Neil, and where, as reason for delivery of bonds to the Prairie Co., we have no judgment, not even a formal agreement, but only a report of O'Neil's statement that he considered they belonged to the company, and had intended to credit them to the company. This question was before the court in *Lewis* v. *United States, supra.* There, officers of a corporation delivered to it property instead of moneys received by them, after receivers of the corporation had filed suit alleging that such officers had no authority to receive the moneys as compensation. The case was compromised by the delivery of property. The officers had in the earlier years returned the moneys as income, and, after compromise as above indicated, sued for refund. The court quotes and relies upon *Ford* v. *Commissioner, supra*, and *North American Oil Consolidated* v. *Burnet, supra*, and concludes that there having been no determination by a court of competent jurisdiction, the Government as to

income tax was not bound by delivery of property in settlement of the amounts received by the corporate officers. We quote:

Plaintiffs make the point that these salaries, commissions, etc., never belonged to the plaintiffs, but were trust funds in their hands as officers of the association. The authorities cited indicate this might be true as between the plaintiffs and the association. That controversy, however, has never been decided by any court or other lawful authority having jurisdiction and is not presented for determination in this litigation. The fact remains that when the plaintiffs received the sums in question they believed themselves legally entitled thereto and later paid them back, not because it had been authoritatively decided that they were not entitled thereto, but to settle litigation. The Government cannot be bound by the taxpayers' own decision or opinion that they took this money without right or authority so to do. The association was divested of the legal title, irrespective of the equities arising from the transaction. In effect the plaintiffs ask that the Government be bound by an agreement entered into between the plaintiffs and the receiver of the building and loan association, to which it was a stranger. * * *

*       *       *       *       *       *       *

Logically, the plaintiffs' argument is grounded on the premise that the monies which the plaintiffs received from and later returned to the association did not belong to them. That they must fail in this suit is clear, because the premise is not supported by the determination of any court, Board of Tax Appeals, or any authority having jurisdiction to determine that question. In effect we are asked to hold the Government conclusively bound by the voluntary act of the parties in returning this money as a result of a compromise entered into with the receiver on the advice of counsel, in doing which they avoided the legal question, whether they were or were not entitled to the money, although the plaintiffs collected the said sums as officers of the association, and believing themselves legally entitled thereto, returned them in the respective years as income.

It is well to remember that a compromise (12 C. J., p. 314), is an agreement between two or more persons who, to avoid a lawsuit, amicably settle their differences by agreement. It implies mutual concessions and the waiver of the respective rights of the parties, but is not an admission of their invalidity.

. We are not cited to any authority, nor can we find any that authorizes the taxpayer to change his tax liability in this manner long after his return is in. Such a rule would be an innovation having far-reaching effects.

The reasoning of the above decision we find to be sound and, together with other cases above cited, controlling here. A purchase by an agent from himself is not absolutely void, but voidable only at election of the principal. We can not here do what the Prairie Co. did not do—have declared void the purchase by O'Neil from his own company so far as claiming the profit involved. It is immaterial to our case that in the *Lewis* case, *supra*, the corporate officers believed themselves entitled to the compensation and made income return thereof, for herein on the facts we have concluded that O'Neil considered the Liberty bonds as income to him, and that they are to be considered such under the law, petitioner not having shown otherwise, by evidence of a mere settlement or compromise between the parties. There is no more strength in the settlement

between O'Neil and the Prairie Co. than there was in the "consent judgment" in *Ford* v. *Commissioner, supra,* and, to use the expressions of that case, in 1922–1923 O'Neil "then considered to be income" the bonds he received, used and kept, even though "the taxpayer exposed himself to possible personal liability."

There is close analogy, also, between the situation herein and in *Board* v. *Commissioner, supra.* The other stockholders in *Board* v. *Commissioner* obviously had and could have no different claim against the liquidating trustees than the claim which petitioner asserts for the Prairie Co. herein—the claim of agency or trusteeship, and the right to profits realized by such agent or trustee. The alleged agent in the cited case made a profit and kept it by surrendering a right to compensation; herein he made a profit and kept it for two or more years, and then settled the liability, if any, in consideration of the delivery not of the original property received, but of other property, not covering or paying interest on a part of the bond coupons which had been clipped. The fact that less than full payment, including said interest, was accepted makes of the deal a settlement. Moreover, O'Neil "wanted to get it settled." This settlement is parallel to that in the cited case. Both cases involved retention of proceeds of profits made by an alleged agent or trustee, for a consideration. When we add the fact of concealed retention for more than two years by O'Neil, reason requires us to conclude that taxation should be applied in the years when the profits were received by the person alleged to be agent. The plea of illegality of an agent's actions was denied effect in the cited case; it must be denied effect here.

The decedent received earnings of the Continental Co. under a claim of right, and possibility that at some future time another taxpayer would assert title to the profits can not, under controlling cases, be used as a refuge for failure to report the income for taxation to the recipient. The revenue act provides a remedy for the recovery of excess tax payments. Income tax liability must be determined on the basis of what occurred and not on what might have happened. Possible claims of the Prairie Co. to all or a part of the earnings of the Continental Co. received by the decedent were a matter for settlement between them.

We can not consider the question of taxation determinable by the conference in Montreal at which the decedent did not make, and the representatives of the Prairie Co. did not, for reasons not fully disclosed, insist upon, a full disclosure of the circumstances under which the decedent received the distributions of profits. Taciturnity such as is exhibited in this matter does not commend the taxpayer. The resolution, of May 1, 1928, by the Prairie Co. and the fact that it paid the transferee liability asserted against the decedent

for unpaid income taxes of the Continental Co. as a liability of the decedent to the Government, rather than its own, is evidence that until then at least, that company regarded the bonds as profits accruing to the decedent in his individual capacity.

Taxes must be reported on an annual basis. If a taxpayer receives moneys under a claim thereto, treating them as his own, any reasonable regard for the fact that taxation is a practical matter compels us to disregard possible claims in equity still unsettled in the taxable year, and hold such moneys to be income, most particularly where, as here, there is full formal ownership in law, deniable only by disregarding the corporation and the distribution of its profits to O'Neil.

There was concealment of income. It was continued, at O'Neil's request by the Prairie Co., even after he delivered bonds to the Prairie Co. There was consciousness on O'Neil's part of liability for tax, for he required the Prairie Co. to agree to pay the tax when he delivered the bonds. He filed a return which did not disclose the receipt of these bonds, and he did not devote any of the bonds to paying income tax as the fiduciary which petitioner now argues he was, although he made no distribution to his alleged beneficiary. These facts not only are amply sufficient for the finding we make of fraudulent return with intent to evade tax, but they positively compel such a finding. To find otherwise would be to disregard the realities of the evidence.

We must and do conclude from evidence which seems to us cogent, clear, and convincing, and hold, that O'Neil received the Liberty bonds for himself individually and that he filed income tax returns for 1922 and 1923 which were fraudulent and made with intent to evade taxes, because of his omission therefrom of reference to distributions to him of profits of the Continental Co.

The petitioner contends in the alternative that assessment and collection of the taxes are barred because of the failure of the respondent to determine the taxes in question within one year after it made a written request therefor under section 250 (d) of the Revenue Act of 1921.[1] It argues that the second proviso limits the operation of the period of limitations generally and has no application to the first proviso. No judicial or executive authority is cited to support the technical ground thus advanced for a favorable decision, and we find none.

---

[1] SEC. 250 (d) * * * *Provided,* That in the case of income received during the lifetime of a decedent, all taxes due thereon shall be determined and assessed by the Commissioner within one year after written request therefor by the executor, administrator, or other fiduciary representing the estate of such decedent: *Provided further,* That in the case of a false or fraudulent return with intent to evade tax, or of a failure to file a required return, the amount of tax due may be determined, assessed, or collected, and a suit or proceeding for the collection of such amount may be begun, at any time after it becomes due * * * *.

Rules of construction are not applied when the language of a statute is clear. *South Carolina Produce Association* v. *Commissioner*, 50 Fed. (2d) 742. The provisions of the section, when read together, are free from ambiguity and clearly provide authority for the determination, assessment, and collection of tax at any time after it becomes due in cases like this one where the returns are fraudulent with intent to evade taxes. The Commissioner so construed it, article 1012, Regulations 62, and he had interpreted provisions to the same effect in subsequent acts in a like manner. Art. 1271, Regulations 65 and 69; art. 1201, Regulations 74 and 77; and art. 275–1, Regulations 94. The Commissioner's practical interpretation of a doubtful statute will not be disturbed except for weighty reasons. *Brewster* v. *Gage*, 280 U. S. 327. We find no merit in the point raised by the petitioner.

Assessment and collection of the taxes involved herein are not barred by the statute of limitations.

Reviewed by the Board.

*Decision will be entered for the respondent.*