Martin T. Manton v. Commissioner.
Manton v. Commissioner
Docket No. 5785.
United States Tax Court
1948 Tax Ct. Memo LEXIS 31; 7 T.C.M. (CCH) 937; T.C.M. (RIA) 48262; November 22, 1948
Conway N. Kitchen, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner challenges respondent's determination of deficiencies in income taxes for the calendar years 1935, 1936, and 1937, and assertion of penalties for filing false and fraudulent returns with intent to evade tax as follows: Year
Deficiency
50% Penalty
1935
$ 6,877.27
$ 3,438.64
1936
115,220.92
57,610.46
1937
51,607.89
25,803.95
Both the deficiency and fraud penalty issues were uncontested at the hearing by petitioner. The deficiencies as determined by respondent, being uncontested, are approved. Findings of Fact Petitioner Martin T. Manton, hereinafter sometimes called Manton, filed Federal income tax returns for the years 1935 and 1936 with *32 the collector of internal revenue for the second district of New York, and for the year 1937 with the collector of internal revenue for the first district of New York. In the 1935 and 1936 returns petitioner reported a taxable net income of $172.55 and $1,542.30, respectively, and in the 1937 return he reported a net loss of $11,819.94. He claimed an exemption for his annual salary as Federal judge of $12,500 for each of the years. For the year 1935 he reported gross income from dividends of $6,026 and deductions of $5,853.45; for 1936, gross income from dividends of $10,250 and deductions of $8,707.70; and for the year 1937 gross income from dividends, interest, and capital gain of $29,014.40 and deductions of $39,339.34. Petitioner is now deceased, having died prior to the date of the hearing in this proceeding. There is no showing here of the appointment of an executor or administrator. Facts Relating to Unidentified Bank Deposits During the years 1935, 1936, and 1937, petitioner had bank accounts solely in his own name at three New York banks: The Fort Greene National Bank, Brooklyn; the Pennsylvania Exchange Bank, New York City; and the Central Hanover Bank, Brooklyn. In *33 the taxable years the total deposits made to the above accounts were as follows: Fort
Pennsylvania
Central
Greene
Exchange
Hanover
Year
Bank
Bank
Bank
1935
$ 81,202.51
$111,963.92
$41,520.48
1936
348,510.34
514,010.25
47,526.02
1937
174,708.49
253,470.51
95,143.46
Those deposits were comprised of bank loans, cash deposits, and check deposits. The total cash and check deposits made to the accounts during the taxable years were as follows: Fort
Pennsylvania
Central
Greene
Exchange
Hanover
Year
Bank
Bank
Bank
1935
$12,100.00
$41,325.00
$41,520.48
1936
11,991.42
78,739.66
47,526.02
1937
37,806.83
70,909.10
95,143.46
Internal Revenue Agent Arthur J. Facteau of the second New York division was assigned in 1940 to work on the income tax case of Martin T. Manton for the taxable years 1935, 1936, and 1937. The original investigation of petitioner's income tax liability had been made by Internal Revenue Agent Edward Cogan, now deceased. During the course of his investigation, Agent Cogan worked in conjunction with Special Agent Ronayne of the Special Intelligence Unit. The three above-mentioned *34 agents, after diligent efforts, were able to identify a part of the cash and check deposits of petitioner as salary checks, dividends, transfers from other bank accounts of petitioner, checks (other than dividends) from corporations in which petitioner owned stock, and miscellaneous other items. In 1940 and 1941, over a period of about seven months, three conferences were held between Agent Facteau and James E. Denning, then attorney for Manton. In some instances explanations were offered by petitioner's attorney for the unidentified bank deposits. Subtracting all identified cash and check deposits, the remaining unidentified cash and check deposits made in petitioner's bank accounts during the taxable years were as follows: Fort
Pennsylvania
Central
Greene
Exchange
Hanover
Year
Bank
Bank
Bank
Totals
1935
$6,000.00
$17,950.00
23,950.00
1936
3,900.00
$13,050.00
9,225.00
26,175.00
1937
3,000.00
5,900.00
8,650.00
16,550.00
Facts Relating to Payments Received from John J. Lotsch Petitioner was the Senior Circuit Judge of the United States Circuit Court of Appeals for the Second Circuit during the years 1935, 1936, and 1937. *35 His chambers were at United States Court House, Foley Square, New York City. John L. Lotsch, during the same years or part of them, was a member of the New York bar and was a director and chairman of the board of directors of the Fort Greene National Bank, Brooklyn, New York. In the summer or spring of 1935, Lotsch became acquainted with William J. Fallon, who in turn was acquainted with petitioner. Fallon suggested to Lotsch that he (Fallon) introduced Lotsch to petitioner in order that Lotsch, in his banking connection, might procure loans for petitioner in return for what was termed "the help" which petitioner could give to Lotsch. Fallon accompanied Lotsch to petitioner's chambers and introduced him to petitioner. At that first meeting, petitioner proposed that Lotsch arrange a loan for him at the Fort Greene Bank. In 1935 Lotsch was instrumental in procuring a loan or loans from the Fort Greene Bank to petitioner. In the spring or summer of 1935 Lotsch was an attorney for the P. & D. Manufacturing Company in the case of Electric Autolite Company v. P. & D. Manufacturing Company. The suit had been filed in United States District Court for the Eastern District of New York on *36 or about March 27, 1931. The lower court rendered a decision adverse to Lotsch's client, which appealed. The appeal was pending in the United States Circuit Court of Appeals for the Second Circuit in the summer of 1935. Fallon, claiming to speak for petitioner, proposed to Lotsch that in return for $5,000 petitioner would submit as his own opinion in the pending case an opinion drafted by Lotsch. Lotsch accepted the proposal, and had another attorney for P. & D. Company draft an opinion reversing the lower court. Lotsch delivered the draft opinion with $4,500 in cash and a $500 check to Fallon in 1935. Petitioner then wrote an opinion containing the substance and conclusions of the draft opinion, and submitted it to Lotsch for his approval. After Lotsch made slight amendments, the opinion was rendered by petitioner in Electric Auto-lite Co. v. P. & D. Manufacturing Co., ( C.C.A., 2nd Cir., 1935), 78 Fed. (2d) 700, reversing 8 Fed. Supp. 314 (E.D.N.Y., 1934). Certiorari was denied 296 U.S. 648 (1935). Petitioner also presided in 1935 over the Second Circuit Court of Appeals in an appeal of the Preferred Electric & Wire Corporation which was represented *37 by Lotsch as attorney. Petitioner rendered an opinion in favor of that company in General Motors Corporation v. Preferred Electric & Wire Corporation (C.C.A., 2nd Cir. 1935), 79 Fed. (2d) 621. Certiorari was denied 296 U.S. 655 (1936). On or about December 19, 1935, an indictment was filed in the United States District Court for the Southern District of New York, charging John L. Lotsch with bribery. Lotsch discussed that case with petitioner in his chambers as well as on several occasions at petitioner's house at Bayport, Long Island. In February, 1936, petitioner informed Lotsch that in the exercise of petitioner's right as presiding judge to make assignments of out-of-town judges in the District Court for the Southern District of New York, petitioner would assign Judge Thomas from Connecticut to sit at the term in which Lotsch's case came to trial and that petitioner would discuss that case with Judge Thomas. In March, 1936, petitioner demanded $10,000 from Lotsch, claiming that it was for Judge Thomas, who had Lotsch's case fixed for a dismissal. Lotsch arranged to borrow the $10,000, and the money was delivered to him in the United States Court House *38 in New York City by his brother just before the case came to trial in March, 1936. Thereupon Lotsch went to petitioner's chambers and gave him $5,000 in cash. Petitioner told Lotsch at that time that he must produce an additional $5,000 or else the arrangement would not be carried out. Accordingly, on the following day Lotsch gave petitioner an additional $5,000 in cash. Both payments of $5,000 were placed by petitioner in a large safe which he had in his chambers. Thereafter the criminal case of United States v. John L. Lotsch proceeded to trial before Judge Thomas, who directed a verdict of acquittal. Later Lotsch was indicted again under another statute for substantially the same offense. His petition for writ of habeas corpus was dismissed by the United States District Court for the Southern District of New York. In a per curiam opinion, with petitioner as presiding judge, the United States Circuit Court of Appeals for the Second Circuit reversed the lower court, sustained the writ of habeas corpus and dismissed the indictment in United States ex rel. Lotsch v. Kelly (C.C.A., 2d Cir., 1936), 86 Fed. (2d) 613. On April 26, 1939, an indictment was filed in the District *39 Court of the United States for the Southern District of New York against petitioner, Lotsch, Fallon, and others. In the indictment petitioner was charged as Senior Circuit Judge of the United States Circuit Court of Appeals for the Second Circuit with conspiracy from January 1, 1930, to April 26, 1939, in conjunction with the other defendants "to influence, obstruct, and impede the due administration of justice" and "to defraud the United States of and concerning its Government function," consisting of the right to have controversies in the Federal courts acted upon and decided, "free from corruption, partiality, improper influence, bias, dishonesty, and fraud." The indictment, brought under 18 U.S.C. § 88[1] further alleged that as a part of the conspiracy Fallon held himself out as intimately acquainted with petitioner, and sought out litigants and parties interested in cases pending before the United States Circuit Court of Appeals for the Second Circuit, and informed them that petitioner would decide such cases in their favor in return for remuneration. The indictment alleged specifically that in pursuance of the conspiracy on or about May 10, 1935, petitioner *40 received a loan from the Fort Greene National Bank in the sum of $10,000, and on or about July 19, 1935, a loan in the sum of $15,000; that on or about June 18, 1935, petitioner as Senior Circuit Judge participated in the hearing of appeal in the case of Electric Auto-lite Co. v. P. & D. Manufacturing Co., supra; that on or about October 7, 1935, petitioner participated in the hearing of appeal in the case of General Motors Corporation v. Preferred Electric & Wire Corporation, supra; that on March 2 and 3, 1936, petitioner received from Lotsch sums of $5,000 each; and that petitioner corruptly rendered his vote, opinion, and decision in favor of Lotsch in the Lotsch habeas corpus proceedings.
Lotsch pleaded guilty to the indictment on April 27, 1939, and on June 20, 1939, he was sentenced *41 to one year in jail and fined $1,000. Petitioner pleaded not guilty to the indictment on April 27, 1939, and he was tried by jury, convicted, and on June 20, 1939, he was sentenced to two years in jail and fined $10,000. The judgment against petitioner was affirmed by the United States Circuit Court of Appeals for the Second Circuit in United States v. Manton (C.C.A., 2nd Cir., 1938), 107 Fed. (2d) 834. Certiorari was denied 309 U.S. 664. Facts Relating to Transactions between Petitioner and Sulmar Realty Company During the year 1937 and for some years prior thereto, the Sulmar Realty Corporation, hereinafter sometimes called "Sulmar," functioned in the capacity of a management concern for the Alamac Esplanade Corporation which held title to a number of apartment houses. Sulmar was controlled by petitioner and James J. Sullivan. Harry S. Reis was employed by Sulmar during at least part of the year 1937 to manage a number of apartment houses. During his period of employment Reis received directions concerning the activities and policies of Sulmar from both petitioner and Sullivan. During the year 1937 in six separate instances Sulmar issued checks up to *42 $5,000 each payable to petitioner in exchange for cash, which petitioner delivered to Sulmar. On these occasions, petitioner would call up and ask Reis whether Reis could exchange a check for him; Reis would reply affirmatively, and would issue a check of Sulmar payable to petitioner in return for petitioner's delivery of cash. At the same time and as part of the same transaction, Sulmar would issue another check in the same amount payable to cash. The cash check was then deposited in the Sulmar account. This procedure by which Sulmar issued two checks upon receipt of cash was not the normal way in which Sulmar handled cash receipts, but was an unusual procedure. In his deficiency notice respondent determined a deficiency of $14,600, "representing cash received by you in 1937 from unexplained sources and turned over to the Sulmar Realty Corporation in exchange for its checks." Petitioner had unreported taxable income in 1935, 1936, and 1937, of at least $23,950, $26,175, and $16,550, respectively. The omission of at least part of these amounts from petitioner's returns in each taxable year was due to petitioner's fraudulent intent to evade tax. Opinion The present proceeding *43 is uncontested, petitioner having died since the filing of the petition, and there having been no substitution of any personal representative or other appearance on his behalf at the hearing. A mere dismissal for lack of prosecution is inadequate for two reasons, first, because of the lurking jurisdictional question which we must consider even though not suggested by the parties, and second because respondent has imposed fraud penalties upon which he has the burden of proof. There is no issue as to the statute of limitations, and, except for the jurisdictional question, a decision for the deficiency in tax could be entered in any event. The jurisdictional question relates to the possibility that petitioner's death could conceivably have the effect of ousting the Tax Court of jurisdiction. See Rules of Practice, [2] Rule 23. We conclude, however, to the contrary. In Michael Duggan, 18 B.T.A. 608, where the original petitioner, a transferee, was represented by counsel at the hearing, notwithstanding that he had died subsequent to the filing of the petition, but there was no substitution of another party, a motion to dismiss on the ground that the action had abated by his *44 death was denied. We there said (p. 625): "* * * The single duty imposed by law on the Board of Tax Appeals is to review the administrative determinations of deficiencies or liabilities asserted by the Commissioner, and to redetermine the amounts, if any, due the Government. It is clear, therefore, that jurisdiction resulting from an appeal here, in conformity with law and our rules of procedure, continues unimpaired until our functions are terminated by decision or dismissal. There is no abatement of an appeal upon the death of the appellant * * *." We are satisfied that jurisdiction exists to dispose of this proceeding. The ultimate conclusion of fact appearing in our findings is determinative of the remaining question. A prima facie showing of fraud based upon unexplained bank deposits has repeatedly been approved. Russell C. Mauch, 35 B.T.A. 617, *45 affd. (C.C.A., 3rd Cir.), 113 Fed. (2d) 555; Gleckman v. United States, (C.C.A., 8th Cir.), 80 Fed. (2d) 394; Joseph Calafato, 42 B.T.A. 881, affd. (C.C.A., 3rd Cir.), 124 Fed. (2d) 187. This is particularly true where, as here, there is other evidence that the taxpayer was engaged in unlawful activities which at once offer a probable explanation of the concealment, and make other violations of law, including tax frauds, less difficult to believe. Rogers v. Commissioner, (C.C.A., 6th Cir.) 111 Fed. (2d) 987, affirming 38 B.T.A. 16. The proof that a taxpayer received comparatively large amounts of income which he did not report justifies the inference that the failure to do so was deliberate, Frank A. Weinstein, 33 B.T.A. 105, a conclusion which is fortified when the recipient is one well acquainted with his obligations under the law. Louis Halle, 7 T.C. 245. Although it is, of course, possible that even the most damaging circumstantial evidence might be explained, the burden of going forward with any such explanation was shifted to petitioner by the prima facie case created by *46 respondent's "clear and convincing" evidence. That burden has, of course, not been borne and it is not unworthy of note that in a situation where the burden was lighter and the consequences more serious than the present, the petitioner was apparently likewise unable to discharge it during his lifetime. United States v. Manton (C.C.A., 2nd Cir.), 107 Fed. (2d) 834, certiorari denied, 309 U.S. 664. The record as a whole convinces us that the fraud charges have been sustained. There is not and could not under the circumstances be any issue raised by the pleadings here as to whether the liability for the fraud penalty survived petitioner's death. Cf. Helvering v. Mitchell, 303 U.S. 391, and G.C.M. 22326, 1940-2 C.B., 159, with National City Bank of New York Executor, 35 B.T.A. 975, affirmed (other points) (C.C.A., 2nd Cir.), 98 Fed. (2d)93. The burden placed by the statute on respondent in fraud cases is solely with respect to "whether the petitioner has been guilty of fraud with intent to evade tax." Section 1112, Internal Revenue Code. Since that burden has been met and since no *47 other issue is raised by the pleadings, and since the failure of any appearance on behalf of petitioner leaves the proceeding otherwise uncontested, Decision will be entered for the respondent. Footnotes
1. § 88↩. "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."
2. "Rule 23. Substitution of Parties. "In the event of the death of a petitioner or for other cause the court may order the substitution of the proper parties * * * "Motions for substitution should be accompanied by a proper certificate of the court or official having custody of the record showing the interest of the party substituted. * * *"↩