Estate of Edward Henry Craddock, deceased (a/k/a Edward A. Craddock) and Florence E. Craddock, Executrix and Florence E. Craddock, surviving wife v. Commissioner.
Estate of Craddock v. Commissioner
Docket No. 1794-66.
United States Tax Court
T.C. Memo 1968-164; 1968 Tax Ct. Memo LEXIS 135; 27 T.C.M. (CCH) 805; T.C.M. (RIA) 68164; July 30, 1968. Filed David M. Scheffer, One Federal St., Boston, Mass., for the petitioners. Rufus E. Stetson, for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies for the taxable periods 1958 through 1962, in the following amounts: Addition to tax Year
Deficiency
Sec. 6653(b)
1968
$ 3,428.57
$ 1,714.29
1959
6,817.56
3,408.78
1960
4,736.74
2,368.37
1961
3,708.61
1,854.31
1962 6,229.41
3,114.71
Total $24,920.89
$12,460.46
*136 The petitioners have conceded the amount of tax due, excluding any addition to tax for fraud. The sole issue for our determination is whether any part of the underpayments was due to fraud under section 6653(b), I.R.C. 1954. [1]
Findings of Fact Decedent, Edward A. Craddock (hereinafter sometimes referred to as Craddock), and Florence E. Craddock (hereinafter sometimes referred to as Florence), filed joint income tax returns for each of the taxable years in question. During this period (1958 through 1962), Craddock and Florence resided in Newton, Massachusetts, and filed their tax returns with the district director of internal revenue, Boston, Massachusetts. Craddock was employed as a purchasing agent by the Sanborn Company of Waltham, Massachusetts (hereinafter referred to as Sanborn). He became Sanborn's purchasing agent in 1952 and continued until March 1964, when he retired. In his position, Craddock had authority to place the orders with any supplier that sold the components with the specifications that had been set by the engineering department. In general, however, the *137 contract was to be let to the lowest bidder and when this was not done, Craddock had to explain to his superiors why a higher bidder received the contract. During the period in question, Arduini Company (hereinafter referred to as Arduini), frequently bid on Sanborn contracts and received substantial orders from the company. Although rarely the lowest bidder, Sanborn considered Arduini's product to be highly satisfactory. Arduini had for many years been a supplier of Sanborn, having become one prior to 1952 and continuing after Craddock's retirement. Early in 1958, Arduini began to pay Craddock amounts which approximated 5 percent of Arduini's sales to Sanborn. Payments were made as shown in the following table and only when Craddock would appear at Arduini's offices to receive them. He deposited the payment checks in his personal bank account. The following are the amounts paid to Craddock during the years in question: *13 1958 Date
Amount
1/18
$ 2,353.82
3/20
1,635.55
5/27
1,670.95
7/30
2,915.13
Undated 2,855.32
$11,430.77 *13 1959
1/ 2
$ 3,163.48
3/ 6
2,732.00
5/14
3,237.48
7/15
3,492.45
10/13
3,595.48
12/15 3,165.97
$19,386.86
*138 806 *13 1960
2/18
$ 2,404.00
4/19
2,175.67
6/13
2,795.53
8/ 9
2,000.00
10/17
1,563.45
12/20 1,698.69
$12,637.34 *13 1961
3/17
$ 2,894.55
5/ 5
1,322.73
6/20
1,594.02
9/15
2,863.92
11/15
2,000.00
12/15 1,065.97
$11,741.19 *13 1962
2/13
$ 3,700.63
4/13
1,461.58 *13 1962
2/13
$ 3,700.63
4/13
1,461.58
6/15
2,424.02
8/27
3,015.41
11/15 3,997.93
$14,599.57
Arduini did not execute or file a Form 1099 [2] with the Internal Revenue Service reporting any of the payments made to Craddock during the period in question, because Craddock persuaded Arduini's bookkeeper that it was unnecessary. None of the amounts paid by Arduini were reported on Craddock's tax returns. Arduini deducted on its own tax return the amounts paid to Craddock as "commissions" expense. Mr. Arduini, president of Arduini, and Craddock were social friends and on occasion dined together. *139 From 1950 until his death in 1965, Craddock was a chronic alcoholic. His drinking to some extent affected his family and business life. In general, his condition did not restrict him from maintaining his job and performing in such a manner as to not appear to be constantly intoxicated. However, Craddock's condition did result in his relinquishing some of his authority to his subordinates. Craddock had episodes of steady drinking followed by resolutions to stop, followed by a failure of the resolutions, and he continued drinking. He belonged to Alcoholic's Anonymous. It helped but did not "cure." He was hospitalized on several occasions and placed on antibuse, a drug prescribed to discourage drinking. He missed many meals and frequently could not eat breakfast because he was so sick. Accordingly, his food intake was considered grossly inadequate. Craddock was a graduate of Fordham University and had a Master's degree in accounting from Columbia University. During the years in question, Craddock did not disclose to anyone counected with Sanborn that he was receiving payments from Arduini. During these years and before, Sanborn had a policy stressing integrity and strongly disapproved *140 of any of its employees receiving gifts or kickbacks from any supplier or customer. Craddock was fully aware of this policy. Moreover, the receipt of these payments from Arduini by Craddock could have been contrary to the Massachusetts General Statutes. [3]
For the taxable years in question, Craddock reported *141 the following amounts of gross income on the U.S. individual income tax returns he filed with Florence: Year
Amount
1958
$13,534.21
1959
13,823.70
1960
19,259.29
1961
14,581.26
1962
22,371.05
Included in the above amounts are 50 percent of the capital gains that he realized during these years. All income amounts shown on the returns, other than capital gains or dividends, were described as wages from Sanborn. For the years in question, Craddock had his income tax returns prepared by the chief accountant for Sanborn. Craddock would turn over his records to this accountant who would then prepare the tax returns from 807 Craddock's records. These records did not disclose the amounts received by Craddock from Arduini. The accountant considered Craddock's records to be a "nightmare," but he was able to prepare acceptable returns from the information furnished. Craddock and his wife would then sign the prepared tax returns and file them. For the taxable year 1963, Arduini began filing a From 1099 reporting the payments to Craddock. For this year Craddock did not have his return prepared by this accountant, and the payments were included as income in Craddock's *142 return for that year. Pursuant to a routine audit of Arduini begun late in 1963, the Internal Revenue Service discovered that no Forms 1099 covering the "commissions" paid to Craddock during the years in question had been filed, and in June of 1964 the Internal Revenue Service conducted an audit of Craddock's tax returns. During discussions with Craddock, he produced substantiation for claimed deductions and intelligently answered the agents' questions. Under questioning, Craddock informed the Commissioner's agents that the payments by Arduini had been omitted from his returns because he had been sick and had simply forgotten about them. In subsequent interviews, however, Craddock denied any knowledge of these payments. But, in further discussions with Craddock, he again admitted receiving the payments, stating that his failure to report them was due to the fact that he was an alcoholic. Ultimate Finding of Fact The underpayments of the tax were due to fraud so as to make the 50 percent penalty under section 6653(b) applicable. Opinion The only issue is whether the underpayments were due to fraud so as to make the 50 percent penalty under section 6653(b) applicable. Whether *143 a taxpayer is guilty of fraud is a question of fact, National City Bank of New York, Executor, 35 B.T.A. 975, affd. 98 F. 2d 93 (C.A. 2, 1938), to be determined from the record as a whole. Luerana Pigman, 31 T.C. 356; A.Raymond Jones, 25 T.C. 1100; Roy R. Yeoman, 25 T.C. 589; Michael Potson, 22 T.C. 912, affirmed sub nom. Bodoglau v. Commissioner, 230 F. 2d 336 (C.A. 7, 1956). The burden is on the Commissioner to prove fraud by clear and convincing evidence. Section 7454, Arlette Coat Co. 14 T.C. 751. Generally, there must a specific intention to mislead or defraud before the penalty will be imposed, Estate of Louis L. Briden, 11 T.C. 1095, affirmed sub nom. Kirk v. Commissioner, 179 F. 2d 619 (C.A. 1, 1950); J.L.Norie, 3 T.C. 676, affirmed sub nom. Coast Carton Co. v. Commissioner, 149 F. 2d 739 (C.A. 9, 1945); National City Bank of New York, Executor, supra, and although direct evidence of the taxpayer's subjective intention is seldom available, it can be ascertained from the surrounding circumstances, including *144 the conduct of the taxpayer and the reasonable inferences therefrom. M. Rea Gano, 19 B.T.A. 518. Petitioners, though apparently conceding the deficiencies by at first not attacking them, now argue that there may not have been underpayments because the amounts received by Craddock may have been loans or gifts from Arduini. In this event, petitioners assert that it is the Commissioner's burden to prove by clear and convincing evidence that these amounts were in fact income taxable to Craddock. The evidence clearly shows Craddock received the payments which are the focal point of this case by checks which were then deposited to his personal bank account. There is nothing in the record to indicate that the amounts were ever intended to be loans or gifts, or excludable from Craddock's income for any other reason, and he himself never so claimed. The only indication that he might have considered the payments nontaxable was his failure to report them on his returns. Actually there is no other evidence that he considered them nontaxable. The Commissioner has shown that the amounts were paid to Craddock in connection with business transactions between Sanborn and Arduini *145 in which Craddock was an important factor. We believe the Commissioner's showing is sufficient to satisfy his burden of proving underpayments. It is unnecessary for the Commissioner to prove the negative, namely, that the receipts do not fall within all the various exclusions in the Internal Revenue Code; prior to trial there never appeared to be any suggestion that these amounts were nontaxable receipts. Without some indication of this contention, the Commissioner is not required to negate every possible argument 808 petitioners might raise. Where, as here, the petitioners argue this as a defense, it must be petitioners who prove the facts necessary to sustain this contention, rather than merely suggesting this later as a possibility which the Commissioner failed to disprove at the trial. On this record we have no doubt that the deficiencies have been properly determined. As stated previously, only fraud is in issue. On the fraud issue, petitioners argue that respondent has failed to prove by clear and convincing evidence that any part of the underpayments was due to fraud. Petitioners contend the Commissioner must prove that it was Craddock's intention to mislead and defraud *146 the Government so as to make the fraud penalty applicable. There can be no quarrel with this contention. On this score, petitioners argue that it was impossible for Craddock to formulate the requisite intent to defraud the Government due to his alcoholic tendencies. Petitioners specifically do not contend that Craddock was insane or non compos mentis. Petitioners do theorize that Craddock's brain was impaired by alcohol and from a grossly inadequate diet, and that he was mentally incapable of committing fraud. As stated above, it is necessary for us to determine Craddock's intention, and in the circumstances this can only be accomplished by inference from his objective acts. M. Rea Gano, supra. Petitioners contend that we should not find that he was fraudulent from the facts, because of his addiction to alcohol with its consequences. We do not agree. There is nothing in the record to indicate that Craddock was always out of touch with reality or that he rarely, if ever, realized what he was doing. True, he did indulge frequently in drink, but this was not constantly, nor is there any evidence that he lost his recollection of many or most events. He blacked out at *147 times and had "lost weekends," but from the record, we cannot find that he forgot all the payments or their character, or on account of his alcoholism that he could not formulate a fraudulent intent. He certainly remembered to collect whatever was due from Arduini and to deposit it to the proper account, his own. He also remembered enough detail to file proper income tax returns, the only exception being the amounts in question here. There is testimony that Craddock's brain could possibly be affected, possibly due to the large quantities of alcohol he had consumed over such a long period of time, or possibly due to his inadequate diet. Although these theories have some plausibility, they still are theories. The testimony of two doctors was vague, equivocal, and dealt in possibilities instead of probabilities, let alone actuality. Moreover, there is nothing in the record to show that Craddock had a faulty memory or was mentally deficient. The doctors' testimony was highly speculative. Moreover, in light of the other evidence, we believe the facts show a consistent pattern indicating an intention to defraud. He was kept on the job throughout the taxable years and there is no evidence *148 of lapses of memory or inability to think straight in regard to his business affairs other than not reporting these particular payments on his returns. As a matter of fact he did report the payments in the first tax year after it became apparent to him that Arduini had filed an information return with the Government. Petitioner places great reliance on Emanuel Hollman, 38 T.C. 251. There we decided it had not been proved by the requisite evidence that a taxpayer, suffering from a severe psychosis, had filed a fraudulent tax return. That case is distinguishable. There, the taxpayer's condition was so severe that his criminal trial was postponed indefinitely and a guardian ad litem had to be appointed for him. This is simply not the case here. As stated above, we do not believe that Craddock was out of touch with reality, other than possibly on his frequent binges, and the facts are not sufficient for us to find that Craddock did not possess the capacity to commit fraud. We believe the facts are more closely alined with Jacob D. Farber, 44 T.C. 408, modifying 43 T.C. 407, where we held that a taxpayer fraudulently filed his tax return even though *149 it was filed during a period of severe emotional strain. The facts, simply stated, show that Craddock received approximately $69,000 from Arduini during the taxable years. He had previously arranged for Arduini to pay him amounts approximating 5 percent of the sales that Arduini consummated with his employer, Sanborn. As purchasing agent for Sanborn, it was within Craddock's discretion to determine from which customer purchases would be made, and even though Arduini was rarely the lowest bidder, Arduini obtained a large amount of business from Sanborn. The amounts Craddock 809 received were considered to be "commissions" by Arduini and were charged as such on its books. Craddock received these payments contrary to the policy of his employer and possibly in violation of State law. He attempted to conceal them by requesting Arduini not to execute and file a Form 1099 disclosing his "commissions" to the taxing authorities. He explained to Arduini that such forms would be unnecessary, as his tax returns would be made out properly and completely without them. Furthermore, Craddock, knowing that the payments were contrary to Sanborn's policy, concealed the fact from Sanborn's plant *150 accountant, the person who made out his tax return for each of the years in question. Craddock undoubtedly knew the accountant would have reported the commissions to Craddock's employer and that this would have led to his dismissal. We believe that Craddock's conduct exhibits facts sufficient to find fraud. His actions were more than excusable omissions of reporting income or misreporting a tax substantially less than the correct tax. Here, Craddock's conduct exhibits a "consistent pattern of unreporting large amounts of income" and a failure to include all of his income in his records. Craddock's persistent understatement of income plus his attempts to conceal the receipts are evidence of his fraudulent intention. Holland v. United Stat--, 348 U.S. 121, 129 (1954); Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court, Rogers v. Commissioner, 111 F. 2d 987 (C.A. 6, 1940), affirming 38 B.T.A. 16. Craddock repeatedly refused to reveal any information about these "commissions" to the accountant who prepared his tax return. Additionally, he attempted to conceal this information from *151 the Government by prevailing on Arduini to refrain from filing an information return with the Government. Craddock's excuse for his misreporting of the income is a further indication of his intent. He simply said that he was sick and forgot. We cannot believe that he simply forgot due to sickness, approximately $69,000 received over 5 years. This amount was so large that it almost equaled his otherwise reportable salary and income during this same period. During this time, Craddock maintained his job, and there is nothing in the record to indicate that he ever had any other problems of failure to remember. The excuse made in his behalf is patently weak. It only indicates a propensity to dissemble. Richard F. Smith, 31 T.C. 1; Estate of Harry Schneider, 29 T.C. 940; Lillian Kilpatrick, 22 T.C. 446, affd. 227 F. 2d 240 (C.A. 5, 1955). His consistent pattern of failure to report income over a period of years without any satisfactory explanation is a factor to be considered in determining the issue of fraud. In addition, Craddock was an educated man, having graduated from Fordham University and from Columbia University with a Master's *152 degree in accounting. Being well educated, he must have known what was expected of him, Luerana Pigman, 31 T.C. 356; Charles F. Bennett, 30 T.C. 114; Albert N. Shahadi, 29 T.C. 1157, 1169, affd. 266 F. 2d 495 (C.A. 3, 1959); Arlette Coat Co., 14 T.C. 751, and we do not believe his misreporting can be dismissed as mere inadvertence, ignorance, or neglect, especially when it was so large, so regular, and so frequent. Emilie Furnish Funk, 29 T.C. 279, 294, affirmed sub nom. Furnish v. Commissioner, 262 F. 2d 727 (C.A. 9, 1958). The facts show that Craddock may have misreported his income based on a desire other than to defraud the Government out of its rightful revenue, as it appears to have been a necessary adjunct to his business activities, i.e., to protect his job. However, even though a nontax motive was present, that does not establish an absence of fraudulent intent. Emilie Furnish Funk, supra. Nor is the fear of disclosing a fraudulent transaction a valid excuse for the failure to report certain income. Jack M. Chesbro, 21 T.C. 123, affirmed per curiam 225 F. 2d 674 *153 (C.A. 2, 1955). From all of the above, we believe the record clearly shows that Craddock's underpayments were due to fraud and that the penalties under section 6653(b) are applicable. Decision will be entered for the respondent. 810 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. Form 1099 is an information return required under section 6041 to be prepared and filed for each payee showing the name and address of the payee, the kind and amount of income paid, and the name and address of the person making the payment.↩
3. Massachusetts General Statutes, Chapter 271, Section 39. Illegal Gratuity, etc., and Penalty. * * * an agent, employee or servant who corruptly requests or accepts a gift or gratuity * * * under an agreement or with an understanding that he shall act in any particular manner in relation to the business of his principal, employer or master; or an agent, employee or servant who, being authorized to procure materials, supplies or other articles, either by purchase or contract for his principal, employer or master, * * * receives directly or indirectly, for himself or for another, a commission, discount or bonus from the person who makes such sale or contract, or furnishes such materials, supplies or other articles, * * * shall be punished by a fine of not less than ten nor more than five hundred dollars, or by such fine and by imprisonment for not more than one year * * *.↩